Dtjreee, Judge,
delivered the opinion of the court :*
This action to recover disability retirement pay was brought by a Navy Commander on the ground that when he was released to inactive duty as physically fit on March 29, 1946, he was physically unfit for service, and should have been retired for service-connected disability.
On October 15, 1965, the court rendered its first decision dismissing plaintiff’s petition. Merson v. United States, 173 Ct. Cl. 92 (1965). Upon the filing of plaintiff’s motion for rehearing, new trial and suspension of proceedings, the court on April 15,1966, entered its order remanding the case “to the trial commissioner with directions to take further and additional evidence on the basis of the materials submitted by plaintiff in the appendix to his * * * motion”. The commissioner was therein directed “to make new findings based on all the evidence bearing upon plaintiff’s condition at the time of his release to inactive duty as physically fit on March 29, 1946, and not limited to evidence relating directly to plaintiff’s physical condition prior to or at the time of said release”. [Emphasis supplied]. The testimony of additional witnesses was presented by both parties.
After a new trial, the trial commissioner has submitted his new findings and report in accordance with the court’s order. Exceptions have been taken, and the case has again been *51 argued on briefs before the court. We now decide that plaintiff is entitled to recover, contrary to our previous decision.
One of our principal conclusions in the prior Merson decision was that plaintiff had “a ten-year period of continuous active and successful employment with no record of any recurrence of malarial or disease symptoms”, after his release in 1946. We shall now reconsider this conclusion in the light of the new evidence presented at the second trial, together with the entire record.
Prior to his naval service, plaintiff had graduated from Harvard Law School in 1938, was associated in practice with two preeminent law firms in New York City and was a highly successful corporation lawyer in excellent physical, mental and emotional condition. His naval career was marked by outstanding ability and success until violent malarial attacks during 1943 at Guadalcanal in the South Pacific brought about his subsequent disability. Following his release from service in 1946, he resigned from his pre-war position as a sales representative for United States Steel Export Company on advice from navy doctors not to return to a tropical climate. For six months thereafter, he was employed by the Electric Boat Company in Groton, Connecticut, at a salary of $700.00 a month until his employment was terminated by his employer for health reasons in October 1946. Upon application to the Veterans Administration on June 10, 1947, he was awarded ten percent disability compensation, effective March 30, 1946, for “nervous condition following recurrent malaria”, with tremors of the head noted. This diagnosis and rating was substantially reiterated by the Veterans Administration in 1948.
From 1947 to 1952, he was employed by the Dixie Cup Company. While so employed, he requested discontinuance of his monthly V.A. compensation payments because “so far as I am able to determine, my condition has not become aggravated, and I find that I am able to earn a livelihood. So long as this condition obtains, I shall make no further claim for compensation”. Although his earnings at the Dixie Cup Company increased for this period of employment from $8,312.53 in 1947 to $20,000 a year in 1952, his employment *52 was then terminated by his employer because of his increasing nervous and emotional affliction, and the tremors of his hands and head. In the words of his employer, “He was more of a liability than an asset”.
After two short periods of temporary employment for the United States Government, October 1952 to July 1953, plaintiff was employed as vice president of Temple University at $12,000 per annum. After seven months, he was asked to resign because he was not well enough to continue, again because of his service disability.
From 1955 until 1957, he attempted to practice law in Philadelphia without success, despite his outstanding prewar legal career. His brother furnished the office, paid the rent and supported plaintiff and his family.
In 1958, unable to find other work, he taught in a North Carolina High School for a school year, at a salary of $3,000. Thereafter, he taught part-time for a short time in a college, but left when told that his work was unsatisfactory because of his physical and mental condition. As far as the record shows, he has had no employment thereafter.
It is clearly evident that, contrary to our former conclusion that plaintiff had “a ten-year period of continuous active and successful employment with no record of any recurrence of malarial or disease symptoms”, the record of post-war employment of this formerly highly successful corporation lawyer is one of continuing and disastrous decline. In 1957, he was rated by the Veterans Administration as 50 percent disabled from “Parkinsonism” originating in service. Thereafter, he apparently has had no gainful civilian employment.
Plaintiff served on active duty for reserve training as a Navy officer for six two-week periods from 1949 to 1956, and was found physically fit by the Navy for active duty for each of these short periods. No defects were noted that would affect performance of his duties. However, these fitness reports were apparently perfunctory lay reports of non-medical officers based upon plaintiff’s clearly apparent willingness and desire to remain in the reserve and to earn a livelihood, as well as the desire of the Navy at the time to retain officers in the reserve if possible. Despite these fitness *53 reports, and recommendations for promotion, plaintiff received no promotion after bis release from the Navy.
In Powers v. United States, 176 Ct. Cl. 388, 401 (1966), this court observed, under similar circumstances, at p. 401:
* * * Nor can much weight be placed upon plaintiff’s certificate of physical capacity, since he was afflicted with a psychiatric ailment (see Ludzinski v. United States, 154 Ct. Cl. 215, 232 (1961) and “neither * * * [he] nor [the] doctors fully knew the nature and extent of his disability at the time of his discharge”. Grubin v. United States, 166 Ct. Cl. 272, 277, 333 F. 2d 861, 863 (1964). And “ [l]ike lawyers, medical men are often poor judges of their own cases * * The events here show that plaintiff was as far wrong as the Army * * * [doctors in knowing] * * * the true course of his disability.” * * *
We noted in Cooper v. United States, 178 Ct. Cl. 277, 305 (1967) evidence that: “Patients may minimize or deny the existence of symptoms to serve particular psychic needs”. There is nothing in the record to indicate that plaintiff was given a psychiatric or neurological examination by the Navy during these short periods of training. Any probative weight that could be attached to these reports is overcome when we consider that during this same ten-year period, the only medical examinations of plaintiff were by the Veterans Administration, whose neurologists found a ten percent service-connected disability in 1947, which was advanced to 60 percent by 1958. During this same period (1949 to 1956) plaintiff’s civilian work record was one of steadily recurrent failures because of his physical and mental condition, despite his constant efforts to continue work.
In Hoppock v. United States, 176 Ct. Cl. 1147 (1966), we noted, at pp. 1165-66:
* * * Being gainfully employed for a period of years does not establish a normal adjustment if underlying the gainful employment there is a history of seven job changes, inability to meet the responsibilities which the employment involved, and failure to retain any of the seven positions for a considerable length of time. The employment record revealing a “socio-economic impairment, moderate to severe” (V.A. psychiatric examination *54 of 10-16-63) tends to confirm rather than discount the other evidence of a neurosis or psychiatric condition contracted during plaintiff’s active service in combat, and medically confirmed as a “true combat fatigue”.
These same observations are applicable to Merson’s employment record, except that plaintiff’s service-connected mental and physical condition has been rated by the Veterans Administration at 60 percent in 1958 as “Parkinsonism”. Certainly there is no substantial evidence in the entire record now before us that plaintiff had “a ten-year period of continuous active and successful employment, with no record of any recurrence of malarial or disease symptoms” from 1946 to 1957. On the contrary, the record is now clear and substantial that during this ten-year period he could not hold a job, despite his constant efforts because of his service-connected disability. Since 1958, he has had no gainful employment as far as the record shows.
In our previous Merson opinion, we commented upon the very close factual question as to plaintiff’s claim that he was unfit for active duty when released from service, citing Boland v. United States, 169 Ct. Cl. 145 (1965) at p. 150:
Treating the evidence as a whole, we cannot say who was right or wrong. * * *
Accordingly, we found that plaintiff Merson had not met his burden of proving that the refusal of the Correction Board to act upon plaintiff’s application was not based upon substantial evidence, or was not arbitrary or capricious. This conclusion was partly upon the basis that plaintiff’s medical evidence was based “largely on diagnostic observations and medical examinations made eleven years after plaintiff’s release, and conceded to be of ‘somewhat limited value in establishing an exact etiology’ ”.
We have now reached an opposite conclusion from the medical evidence, based upon the entire record before us, including the lay and expert medical evidence introduced at the new trial as to plaintiff’s physical condition during and after his naval service.
Essentially, plaintiff had established in the prior case that following active combat duty in the Pacific Theater in 1942, *55 be suffered long, severe and virulent attacks of malaria at Guadalcanal in February 1943, following wbicb be was hospitalized most of tbe time in ten different naval hospitals for over two years with a continuing diagnosis of “Malaria, Malignant Tertian, #1004”. On January 19,1944, following discharge from a naval hospital, a board of three navy doctors found that he was “physically qualified for limited shore duty only". [Emphasis supplied.] In April 1944, he was promoted to Lieutenant Commander (temporary) and was found fit for active duty at sea or on foreign service.
In March 1945, following a physical examination, plaintiff was issued a $5,000.00 life insurance policy, with a history of hospitalization for malaria in 1943 at Guadalcanal. However, this examination did not include neurological or psychiatric examinations, probably because plaintiff stated he had had no malarial attacks since 1943.
In April 1945, plaintiff was operated on for hernia. He was given unusual care because of his history of “latent malaria” and “8 malarial lapses”, but received no neurological or psychiatric examinations, and was discharged to duty as fit. On June 16, 1945, the Neurology Department of the Bethesda Naval Hospital noted “Facial tremors * * * Generalized abnormal EEG”. An “EEG”, or electroencephalogram, had been previously requested by a navy doctor, following an eye examination of plaintiff. An electroencephalogram is made with an “electroencephalograph” which detects and observes abnormal brain waves by recording electrical impulses between electrodes placed over designated areas of the brain. There was a later report on July 3rd of a second encephalo-gram with the same observation, “Generalized abnormal EEG”. These and further observations led to the conclusion at the hospital on July 3, 1945, that "Regardless of any organic cranial lesion that he may have (sic) He manifests a definitely neurotic reaction and attitude, both of which merit tense fsychiatme attention”. [Emphasis supplied.] Ten days later, on July 13th, plaintiff’s original diagnosis of “No disease, headache” was changed to “Asthenia, Post-infective”. We find this last general conclusion that plaintiff’s condition was merely one of debility or loss of vitality completely at *56 odds with, the specific findings previously noted, and even more so, when four days after this general diagnosis of as-thenia, the neurologist at the Bethesda Naval Hospital noted that, although a good part of plaintiff’s disability was psychogenic, “the fact that he had cerebral malaria and changes on his electro-encephalogram cannot be ignored”, and again noted that his definite neurotic reaction and attitude merited “tense psychiatric attention”. Obviously, his condition was one of close concern for the specialists who examined him.
For the ensuing five months, until January 1, 1946, plaintiff was a patient in a convalescent hospital at Asheville, North Carolina, described by one of the navy doctors then on duty there as “largely a place where you could come and sleep and eat, look after' yourself as you pleased”. He received no specific treatment for his condition other than rest.
During this five months’ hospital convalescence, on October 15, 1945, plaintiff appeared before a Board of Medical Survey, which found plaintiff “unfit for duty” in its report of medical survey, and recommended further treatment. Only a month later, on November 16th, a Board of Medical Survey found that plaintiff was “physically able of assuming full duty”. This conclusion was again reached on January 1,1946, in reporting plaintiff physically qualified for temporary promotion to Commander, and the next day a Board of Medical Examiners found plaintiff physically qualified for release from active duty, and he was released, following terminal leave, on March 29, 1946, “incident to demobilization”. We note these words because of their significance in this case.
This court has repeatedly had occasion to observe that during the vast process of suddenly demobilizing hundreds of thousands of World War II veterans during 1945 and 1946, the exigent circumstances in the Medical Services did not permit, as a practical matter, thorough physical examinations prior to release from military service, even when warranted by the medical history. This has been particularly evidenced when veterans like this plaintiff have insisted that they were physically fit in order to be released from military *57 service to resume their normal civilian careers. In Hoppock, supra, we note at p. 1166:
The terminal physical examination given plaintiff on September 25, 1945, and the promotional physical examination of October 19,1945, deserve comment because of the Board’s apparent reliance on the findings made therein with regard to plaintiff’s physical qualifications. It would se&m sufficient to state that no psychiatric or neurological examinations were made when those examinations were accomplished, although plaintiff’s history of combat neurosis is noted in each examination report. Suffice it to say that during the mass demobilization of 600,000 officers and nearly 8,000,000 enlisted men from 1944 to 1946, “terminal physical examinations were not as thorough as they might have been in many cases and that a more intensive investigation * * * might have developed hidden clues of things to come”. Smith, supra, at 549. See also Woodard v. United States, 167 Ct. Cl. 306, 310-11 (1964). [Emphasis supplied]
In the present case, Dr. Shumway was a member of the Board of Medical Survey that (on October 15, 1945) found plaintiff “unfit for duty” and requiring further treatment. He was also a member of the Board that one month later found plaintiff “fit for duty”. At the new trial, he stated that this “fit for duty” finding was made even though there was no substantial change from plaintiff’s condition at the time of the first Board’s “Unfit for duty” finding. Dr. Shumway also stated that there was a tendency of doctors to overlook symptoms because of the pressures of the ending of the war, and everyone wanting to go home. In addition, the hospital was scheduled to be closed in February or March 1946.
Beadily apparent is the fact that despite repeated warnings of “facial tremors”, “Generalized abnormal EEG”, the need for “tense psychiatric attention of his neurotic reaction and attitude * * * regardless of any cranial lesion he may have”, regardless of “the fact that he had cerebral malaria and changes in his electroencephalogram (which) cannot be ignored”, this alarming prognosis was ignored by the Medical Board which found Merson fit for duty at the time of his release. None of the members of this Board was a neurologist *58 or psychiatrist. Other than noting a history of “malaria— 1943 XJCD” * * * “May 1945 last recurrent attack”, there is nothing in the record of the report of January 2,1946 by a Navy Board to the U.S. Naval Personnel Separation Center to indicate that the prior prognosis and specific warnings from the specialists were given the serious and careful consideration that they required. From the expert medical testimony by three distinguished specialists in neurology and psychiatry at the new trial, as to plaintiff’s brain condition, it is obvious that this condition could not have been properly evaluated at the time of his release without further psychiatric and neurological examinations. Equally obvious is the fact that whenever plaintiff was examined by neurologists or psychiatrists before release, his disabling psychiatric and neurological symptoms were repeatedly observed and noted in his medical record. We conclude that plaintiff did not have a thorough or competent medical examination at the time of his release, because of mass demobilization, and because his condition was difficult to accurately diagnose at the time. Furthermore, because of complete rest, relaxation and rehabilitation for five months at the convalescent hospital in Asheville, North Carolina, plaintiff’s condition, although disabling, may well have been quiescent or in a state of temporary remission during his inadequate medical examination upon separation.
Most recently, in the case of Brown v. United States, 184 Ct. Cl. 501, 396 F. 2d 989 (1968), we held that in reviewing administrative service decisions, including those of Correction Boards as to “substantial evidence” on military disability retirement pay cases, this court is not limited to the administrative record, and may take account of de novo evidence as to claimants’ physical condition at the time of release and thereafter.[1] The Government did not object to the introduction of de novo evidence in the present case, and accordingly, waived any possible objection. Cf. Russell v. United States, 183 Ct. Cl. 802 (1968).
*59 We must now re-determine whether the decision of the Correction Board is based upon substantial evidence.
In some cases, the court has found medical examinations and medical history subsequent to discharge highly probative as to physical condition at the time of separation because of an incomplete or inadequate examination at the time of separation, such as we find in the present case. Most of these cases arise out of the exigencies of mass demobilization following World War II, and the Korean conflict, which we have already discussed. See, e.g., Hoppock, supra.
In the case of Walters v. United States, 175 Ct. Cl. 215, 358 F. 2d 957 (1966), the court discussed the relevancy of post-discharge medical evidence and the burden of proof which rests upon plaintiff once he has been found fit for duty, at p. 225:
The test for recovery, however, does not rest solely on the reasonableness of the action of the examining physicians at the time of release from active duty. The petitioner may prevail if he can show that if the complete facts concerning his condition had been known at the time he would have been entitled to retirement by reason of physical disqualification under the pertinent laws and regulations, (citations) To this end, reference must of necessity be made to Ms subsequent medical history insofar as it sheds light on the nature of his physical condition while in service. Evidence of progressive deterioration and later discovered symptoms and disabilities may be decisive if it can establish that plaintiff’s incapacity while in service was substantially more serious than suspected and that previous diagnoses were inadequate or incorrect. * * * [Emphasis supplied]
The necessity of considering subsequent medical history in this light has been repeatedly emphasized by this court in Hoppock, supra; Farrar v. United States, 173 Ct. Cl. 1008, 358 F. 2d 965 (1965) ; Harper v. United States, 159 Ct. Cl. 135, 140, 310 F. 2d 405 (1962) ; Grubin v. United States, 166 Ct. Cl. 272, 301, 333 F. 2d 861 (1964), and other cases. The need for consideration of subsequent medical history was a basis for the order for new trial in the present case.
Nevertheless, the opinions of the medical witnesses for defendant have been limited almost completely to the naval *60 medical records in existence at the time of ‘plaintiff’s release. Dr. Diamond, defendant’s medical witness at the new trial, in summary testified that in his opinion that plaintiff was fit when released, was based solely on the evidence which existed prior to the time of plaintiffs release, although he had read some of the post-release reports. His conclusions were based upon an erroneous premise that because the consideration of post-release evidence involved “retrospect”, it was not material. In Walters, supra, (p. 226), the court stated that new evidence presented to a Correction Board nine years after release “establishes in retrospect quite clearly that plaintiff’s condition was incapacitating and permanent”.
None of defendant’s medical witnesses ever saw or examined plaintiff, except Dr. Shumway, who became a witness for plaintiff at the second trial after he had evaluated the new evidence.
He was one of the three Navy doctors on the Board which first found plaintiff unfit for duty on October 15, 1945. One month later, he was on a different Navy Medical Board which found plaintiff fit for duty shortly before his release. None of the other four Board doctors testified. Dr. Shumway testified at the new trial that he again saw plaintiff in 1947, about a year after his release, that he displayed marked tremors of the head and hands, and was mentally disturbed; that plaintiff had the Parkinsonism syndrome, and in the light of all the evidence, plaintiff had a psychiatric condition, and an organic injury to his brain incurred in service, which caused his disability, which existed at the time of release and rendered him unfit for active duty.
Certainly no other medical witness in this case had the great advantage of Dr. Shumway’s actual observation and knowledge of plaintiff’s condition at the time of release, and thereafter. His change of opinion in favor of plaintiff on the basis of the new evidence and re-evaluation of the old evidence is completely supported by the expert testimony of three distinguished specialists in neurology and psychiatry, all of whom observed and examined plaintiff, and carefully evaluated all the medical evidence, old and new.
Dr. Harold Stevens, a distinguished specialist in neurology and electroencephalography, examined Merson twice in 1968. *61 On the basis of these examinations and a review of the Navy medical records, the post-release medical records of the Veterans Administration, and the entire record before him, he testified that in this frame of reference, plaintiff was “definitely incapacitated” and unfit for duty when released in 1946.
Dr. Hitzig, another distinguished specialist, after examining plaintiff in 1957, and on the basis of the medical records hereinabove referred to, testified that plaintiff was unfit at the time of release, with practically the same analysis of the record followed by Dr. Stevens.
Dr. Daniel S. Feldman testified extensively at both trials. He is a specialist in psychiatry and neurology, and also was a medical officer in the Navy (1954 — 1956), and is conversant with the Navy standards for fitness for service. Upon the basis of the new evidence at the second trial, together with the entire medical record, he concluded that plaintiff was at the time of his release, unfit for naval service.
Dr. I. Kotzin of the Veterans Administration, who had made earlier psychiatric examinations of plaintiff for the V.A., on December 17, 1959, reviewed the entire clerical record for the V.A. and concluded:
Now that years have gone by and symptoms have become progressively worse the symptoms and findings at the Navy take on more light. One may conclude that the facial tremors were the incipient manifestations of Parkinsonism Disease. It is well known that this disease starts very slowly and it may take some time until the diagnosis is made.
Considering the picture, as a whole it is my certified opinion that Parkinsonism may have well began [sic] while he was in service.
Diagnosis: (1) Anxiety Eeaction, moderate to moderately severe with depressive features. (2) Parkinsonism Disease.
On February 1, 1960, the V.A. thereupon concluded that plaintiff’s disability was “Parkinsonism”, service-connected and rated at 60 percent.
The governing standard of disability to which we adhere is well summarized in the Synopsis of Opinions of the Naval *62 Judge Advocate General (1958), referred to in our previous findings and prior decisions:
The general standard of fitness must be applied, in the case of an officer of the line, to all of the duties or billets in which such officer must normally, in the course of assignment over a period of time, find himself serving.
With respect to disability proceedings, the standard long applied in the naval service is whether the individual is or is not physically capable of performing all the duties of his rank, grade or rating to a degree that would reasonably fulfill the purposes of his employment.
In our prior opinion, we pointed out that, although the Correction Board in denying plaintiff’s application, was not required to hold a hearing:
* * * The Board might have been well advised under the particular facts in this case to grant a hearing as twice requested by plaintiff. Whether he was fit for service when released would appear to be a complicated and difficult question of medical evidence and opinion that should have been gone into thoroughly by the Correction Board and a hearing for plaintiff would have been helpful. Plaintiff has never had any hearing of any kind before any Retiring Board, any Correction Board, or any other kind of a board. Merson, supra, at pp. 99-100.
Upon reconsideration of the entire record now before us, we conclude that plaintiff was unfit for active duty by reason of psychiatric ailments and organic brain damage incurred in service, and existing at the time of his release from the Navy on March 29, 1946, and that the decision of the Correction Board and the Secretary of the Navy was arbitrary, not supported by substantial evidence and contrary to the evidence and naval regulations.
Dr. Shumway, one of the Navy doctors who found plaintiff fit for duty (1946) and then changed his opinion at the second trial upon a review of the entire medical history and his own observations of plaintiff after his release, concluded in a statement in the record:
I have found this review a most interesting experience and I am grateful that you called upon me to review one of my own actions taken 20 years ago. Having worked *63 in the Veterans Administration, Department of Medicine and Surgery for this same period of time, I could wish that many other physicians might have a similar experience, since it teaches one again that in Medicine humility is the handmaiden of time. [Emphasis supplied]
We may well paraphrase Doctor Shumway’s conclusion, to observe that this review of our own 1965 Merson decision teaches us that in Law, as well as in Medicine, “humility is the handmaiden of time”.
Plaintiff is entitled to recover disability retirement pay from the day following the date of release from active duty, less amounts received as disability compensation from the Veterans Administration*, and pay for Eeserve Officer training aad eúrüian eenapensatíee*, since his release from active military service. See, Motto v. United States, 175 Ct. Cl. 862, 869, 360 F. 2d 643 (1966). Judgment is entered for plaintiff in accordance herewith with the amount of recovery to be determined pursuant to Eule 47(c).
FINDINGS or Fact
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, an officer of the Naval Eeserve, who served on active duty during World War II, sues for retirement pay from March 29, 1946, the day he was released (as physically fit for duty) to inactive duty.
2. The plaintiff, who was bom August 21,1906, graduated from the United States Naval Academy in June 1928, and thereafter served as an officer of the Eegular Navy until September 10, 1930, when he resigned from the Eegular Navy. At that time, he accepted a commission in the Naval Eeserve, which he held from October 21, 1930, until August 30,1939.
In the meantime, the plaintiff attended Harvard Law School, from which he graduated in 1933.
*64 3. The plaintiff’s resignation from the Regular Navy in 1930 was tendered to enable him to attend law school and was unrelated to his health, which was excellent at that time.
4. After graduation from Harvard Law School in 1933, the plaintiff was employed by a New York City law firm until 1936, when he became resident counsel for American Radiator & Standard Sanitary Corporation. He held this position until February 1940, when he went to South America as a sales representative for United States Steel Export Company. •
By March 1942, the plaintiff had returned to the United States and on March 21 of that year was given a physical examination in connection with his application for a commission in the Naval Reserve. He was found not physically qualified for appointment as an officer by reason of defects relating to a deviated nasal septum, left moderate — not obstructing, dentally disqualified (a number of teeth missing) and he was 11 pounds under standard weight.
On May 18, 1942, the above-noted defects were waived by appropriate naval authority and on May 25, 1942, he was found physically qualified for active duty by virtue of the waiver referred to above. He accepted an appointment as lieutenant, United States Naval Reserve on May 25, 1942, and on May 29, 1942, he reported for active duty.
5. After a short period of training in continental United States, the plaintiff was assigned to and served as a fire control officer aboard the light cruiser Helena. He served in this capacity from July 4, 1942, until January 2, 1943. During that time, the Helena participated in three major engagements with the enemy. On January 4, 1943, the plaintiff reported to the Advance Naval Base at Guadalcanal in the Solomon Islands, where he was assigned duty as executive officer.
6. Within 23 days after reporting at Guadalcanal, on January 27,1943, the plaintiff was hospitalized at the United States Naval Base, Lunga, Guadalcanal, with a diagnosis of fever, cause undetermined. He complained of fever, chills, backache, headache and general malaise and had a temperature of 102.6 degrees. This was recorded as the first attack of the plaintiff. He was discharged to duty on February 2,1943.
*65 7. On. March 3, 19,43, the plaintiff was again hospitalized with the same complaints, the same diagnosis and a temperature of 101.4 degrees. A blood smear for malaria was taken and found to be negative. He was discharged to duty on March 6,1943.
8. On April 1,1943, the plaintiff was again admitted as a patient at the same hospital. The diagnosis of his condition at this time was “Malaria, Benign, Tertian, #1004.” A blood smear was taken and it was found to be positive for “Plas-modium Vivax.” His temperature was 103 degrees. He was discharged to duty on April 4,1943.
9. The plaintiff’s fourth hospitalization at the same hospital occurred on May 3, 1943. The diagnosis was “Malaria Malignant.” The blood smear was positive for “Plasmodium Falciparum.” It was the examining physician’s recommendation that the plaintiff should be transferred to a base hospital, destination unknown, and that he not be returned to that area. This recommendation was approved by higher authority and he was evacuated to Base Hospital #3, Espíritu Santo, New Hebrides, for further evacuation.
He was transferred to the U.S.S. Tryon on May 7,1943, by which he was transported to U.S. Naval Mobile Hospital No. 4, Aukland, New Zealand. The pertinent medical record while the plaintiff was aboard the U.S.S. Tryon reads as follows:
U S S TRYON. 5-7-43. Diagnosis: MALARIA, MALIGNANT TERTIAN #1004.
Not misconduct. Appears very sick and tired. Markedly dehydrated. Is very apprehensive. Marked nausea Temperature 103. Given 1,000 cc of 5% Glucose Sol. intravenously. 10 grs. Quinine tid.
5-8-43: Appears much better. Temp, normal, nausea stopped. Rx.: 2,000 cc of 5% Glucose given intravenously. Continues Quinine.
5-9-43: Better. Bland diet 10 grs. Quinine.
5-11-43: Eating well, no temp., recovering Quinine grs. X tid continued.
*66 5-12-43: Transferred this date to M.O.B. #4 for further observation and treatment.
/s/
E. D. ANDERSON, Lt.Comdr. (MC), USNR.
Approved:
/s/
A. M. SNELL, Capt. (MC), USNR.
10. A Board of Medical Survey (three officers of the Medical Corps) convened on May 13, 1943, at Mobile Hospital No. 4 to consider the plaintiff’s condition. The diagnosis was “MALARIA, MALIGNANT TERTIAN #1004.” He Was found to be unfit for duty with the probable future duration classed as indefinite. It was the recommendation of the Board that the plaintiff be transferred to the nearest naval hospital. The statement of facts as found by the Board is as follows:
The patient has been stationed at USN Base Lunga since January 4, 1943. On January 27, he developed chills, fever, and general malaise and was confined to the sick bay for 5 days. The blood smear was negative for plas-modia, and the exact type of medication administered cannot be determined. A diagnosis of Fever, Cause Undetermined, #1309 was made. On March 3, the patient again developed fever, chills, backache and general malaise and was admitted to the sick bay for three days. The blood smear was negative for plasmodia and a diagnosis of Fever, Cause Undetermined was made again. On April 1, Fever, Chill and headache recurred; the blood smear was positive for plasmodium vivax and treatment with quinine was instituted. A diagnosis of Malaria, Benign Tertian, 1004 was made. On May 5, fever, chills, headache and general malaise recurred once more, and on this occasion the blood smear was positive for plas-modium falciparum. A diagnosis of Malaria, Malignant Tertian, #1004 made and therapy with quinine was instituted. There was persistent nausea and vomiting and this attack, [sic] and the patient became quite markedly dehydrated. On 5-6-43 he was transferred to the USN Base Hospital No. 3 and on the following day transferred further to the USS Tryon for transportation to this hospital. At the time of admission here the temperature was normal, and the only symptoms consisted of nausea, anorexia, weakness and the loss of 25 lbs in weight. Examination revealed a poorly nourished indi *67 vidual obviously exhausted and moderately j>ale. The spleen was palpable just below the costal margin but was not tender. Malaria smears were negative. Quinine is being continued. The patient’s general condition is such that he will require a prolonged period of convalescence. It is therefore recommended that he be transferred to the U.S. for further treatment and disposition. He should not be assigned to further duty in a malarial country in the future.
11. On May 15,1943, the plaintiff was transferred for shipment to the United States aboard the SS Lurline from which, in turn, he was transferred, on May 30, 1943, to the U.S. Naval Hospital, San Diego, California. The admitting diagnosis was “malaria, MALIGNANT tertiaN.” His physical examination on that date showed a weight of 135 pounds which was 14 pounds below his weight on May 25, 1942, when he was examined for active duty in the Navy (see defendant’s exhibit T, pages 105 and 54). The impression of the examining physician was “Malaria, convalescent.” On June 5, 1943, smears for malaria were negative. On June 15, 1943, he was given 30 days’ leave. Following this, he was transferred to the U.S. Naval Hospital, St. Albans, Long Island, New York on July 27, 1943. The admitting diagnosis there was “malaria, maligNANT tertlah #1004.” The entry in his medical records concerning hospitalization at this facility reads as follows:
U.S. NAVAL HOSPITAL St. Albans, L.I.,N.Y.
RA: 7-26-43
Diagnosis: MALANIA, MALIGNANT TEKTIAN #1004
Origin: Not misconduct.
PI: Patient was at Guadalcanal and had first attack of Malaria 2-1-43. This attack was severe, malignant ter-tian type. Second and third attacks were not so severe coming about one month apart. The fourth attack on 5-3-43 was extremely severe. Blood smears showed vivax and falciparum in last attack. Patient was evacuated on 5-6-43 to New Hebrides. Had nausea and vomiting and was extremely sick. Put on [sic] hospital and brought back to the Ü.S., arriving in San Diego on 6-5-43 and arrived back home on sick leave on 5-20-43. He had been *68 home for 35 days and was admitted here for further study. Since he has been home he has had no recurrence. PH&FH: Negative.
PE: Shows healthy male mentally alert and cooperative. Physical examination is entirely negative and the general condition is excellent.
Treatment: Except for laboratory study none required.
Progress: Repeated blood smears negative for plasmodia. Laboratory findings neg. On 8-26-43 patient had a severe chill, nausea, vomiting, headache, backache and general malaise. Temp. 102° and obvious manifestation of a malarial relapse. Blood smear positive for plas-modium vivax. 1000 c.c 5% glucose in normal saline intravenously. Quinine therapy instituted but was unable to retain the quinine. Given I-V. therapy for several days and was able to retain the quinine without difficulty. On 8-30-43 he was asymptomatic and feeling very well. Since this episode he has had repeatedly negative smears. At the present time he is considered well enough to return to duty provided that such duty be outside of malarial territory.
11-1-43 This date patient was presented before a Board of Medical Survey which recommended that he be assigned to shore duty for a period of 6 months, preferably within the Third Naval District.
/s/
F.O. MEYERS Lt.Cdr. (MG) USNR
D 11-26-43 Discharged to limited shore duty this date 123 in accordance with approved recommendation of a Board of Medical Survey. AUTHORITY: Bu Pers letr. 62081 Pers-31554-SSW-2 of Nov. 18th, 1943.
/s/
F.C. MEYERS LT. COMDR. (MG) USNR
APPROVED: /s/
B. H. ADAMS
12. The report of medical survey of November 1, 1943, referred to in the previous finding found the plaintiff’s condition at that time to be unfit for sea duty and the probable future duration indefinite. It was therein recommended that the plaintiff be assigned to 6 months’ shore duty, preferably within the Third Naval District, and that in so far as possible he be not assigned to duty in a malarial district in the *69 future. The facts as found, by the Board are quoted in full, as follows:
This 87 year old Lt. USNR, with 1 year 7 months service during the present emergency was admitted to this hospital on 7-26-43 from the U.S.N.H. San Diego, Calif, with the diagnosis MALARIA MALIGNAR T TERTIAN #1004. He had been on duty in the southwest Pacific area and was stationed at USN Base Lunga since 1-4-43. On 1-27-43 he began to have fever, chills, headache, backache and general malaise. Blood smears were negative for plasmodin, and a diagnosis of Fever, Cause Undetermined #1309 was made. He was discharged to duty 5 days later. On 3-3-43 the same manifestation recurred and blood smear was again negative, and again the same diagnosis was made. Three days later he was discharged to duty. On 4-1-43 he had a third attack of malaria, with chills and fever, and his blood smear was positive for plasmodium vivax. A diagnosis of Malaria, Malignant Tertian #1004 was established and specific treatment with quinine and atabrine was instituted. On 5-5-43 he had another attack. Blood smear was positive for Plasmodium Falciparum. With this attack there was persistent nausea and vomiting and the patient became markedly dehydrated. There was no improvement in his condition and he was transferred to the USN Base Hospital No. 3 on 5-6-43 and on the following day was transferred to a ship for transportation to the USN Mobile Plospital No. 4. At the time of admission to that hospital his condition was poor. His temp, was normal but he was cachectic and had lost 25 lbs. in weight. His chief complaints were weakness, anorexia and nausea. The spleen was palpable below the costal margin but was not tender. Blood smears were negative for malaria. He was in need of prolonged convalescence and was returned to the U.S. for further treatment. On 5-15-43 he was transferred to the U.S.N.H. San Diego where he was given convalescent care and transferred to the U.S.N.H. St. Albans, L.I., N.Y. on 7-26-43. On admission'to this hospital his condition was good and he was asymptomatic. His laboratory findings were completely negative. He remained free from symptoms until 8-26-43 at which time he had a chill, temperature of 102° and nausea and vomiting. Blood smear was positive for plasmodium vivax. Quinine therapy was instituted and all symptoms promptly subsided. He was given the required course of quinine therapy and has progressed satisfactorily. Since 8-30-43 *70 all blood smears bave been negative for plasmodia. Blood count and hemoglobin are normal; urine negative. He has been entirely asymptomatic since 8-30-48. It is the recommendation that this officer be assigned to shore duty for a period of 6 months, preferably within the Third Naval District. It is further recommended that in so far as possible he be not assigned to duty in a malarial district m the future.
The Bureau of Medicine and ¡Surgery upon consideration of the recommendation of the Board referred to above, on November 6,1943, modified it, stating to the Bureau of Personnel that the plaintiff was considered “fit for duty at this time, but it is recommended that he be detailed to shore duty in a temperate climate for a period of at least six (6) months.”
13. It appears that during much of the interval between July 27 and November 26, 1943, the plaintiff was home on sick leave. He was, however, treated at the hospital from time to time, and on one occasion had an attack of malaria and was transported from his home to the hospital by ambulance. He was entirely without symptons of disease from August 30 to November 26, 1943. He was on the latter date, discharged from the hospital and detailed to duty with the Bureau of Naval Personnel in Washington, D.C.
14. On December 10, 1943, the plaintiff had a very severe chill and he reported to the Naval Dispensary, Arlington Annex at 10 a.m. After a blood smear which was positive for “Malaria, Malignant Tertian,” the diagnosis was “malaria, MALIGNANT, tertian. #1004.” He was unable to hold a thermometer in his mouth and his skin was hot and dry. Because of the number of recurrences of malarial attacks as well as their severity, hospitalization for an intensive course of treatment was indicated. He was, accordingly, on that date, transferred to the U.'S. Naval Hospital, National Naval Medical Center, Bethesda, Maryland.
15. From December 10,1943, to December 20,1943, plaintiff was hospitalized at the U.S. Naval Hospital, Bethesda, Maryland. On December 13,1943, the admitting diagnosis of “Malaria, Malignant Tertian #1004” was changed to “Malaria, Benign Tertian #1004.” Laboratory reports taken dur *71 ing this period showed that on December 10, 1943, malaria smears were positive for malaria parasites, i.e., plasmodium vivas. The same finding was reported on December 11,1943. On December 20,1943, there was entered in his medical history at the U.S. Naval Hospital, Bethesda, Maryland, the following:
12-20-43 This officer was admitted to this hospital 12-10-43 with his sixth attack of vivax malaria. The only laboratory studies of note were the positive blood smear for malaria, and the presence of a mild secondary anemia. He was given a week’s course of Atabrine with an uneventful convalescence.
D 12-20-43 Discharged to duty this date. Well. (7)
16. As a result of an annual physical examination, completed on January 19,1944, by a Board of three Navy doctors (two physicians and one dentist), the plaintiff was found to be “not physically qualified to perform all his duties at sea”; however, he was found to be “physically qualified for limited shore duty only.”
17. On April 22, 1944, plaintiff was given a physical examination to determine his physical qualifications for temporary promotion to lieutenant commander. He was found to be fit to perform active duty at sea or on foreign service. He was also found to be “physically qualified for temporary promotion to Lt. Comdr. DE-Y(S), USNR.” It is noted that this examination was likewise performed by a Board of three Navy doctors. Dr. ft. H. Holler, the senior medical officer at the U.S. Naval Dispensary, Arlington Annex, Navy Department, was a member of this Board, as well as a member of the Board referred to in finding 16. As a result of this examination, the plaintiff was promoted to the rank of lieutenant commander (temporary) effective April 15, 1944.
18. In an Officer Qualification Questionnaire of January 24, 1945, it was stated: “Because he suffers from the effects of malaria, he is not considered physically qualified for sea duty”; and in the Fitness Report of February 15, 1945 for the period 3/31/44 to 2/10/45, it was said: “Because Lt. Comdr. Merson’s health is impaired from the effects of *72 malaria be is not considered physically qualified for sea duty or duty in tropical or semi-tropical climate.”
19. Plaintiff was assigned to EXOS, the Executive Office of the Secretary of the Navy, from February 10 to June 25, 1945. While there, he worked on surplus property directives. Mr. John Milton Cooper, one of his associates at EXOS, testified as follows as to plaintiff’s condition at that time:
“* * * Merson was a very intense man, and, as a layman, I would say completely anti-social * * *. I felt sorry for him, he was, not being a doctor, but to all of us obviously a sick man, and he could start a job with great enthusiasm but he did not seem to be able to carry through on it * * *. So in the parlance of the Navy why we considered Merson an odd ball. He did not try to get along with his fellow workers.
“He had a tremor, when he would get excited he had a distinct tremor, he would jerk his head, and I noted a nervousness of the hands.”
20. On March 6, 1945, the plaintiff was given a physical examination pursuant to an application for insurance which he'had made to The Equitable Life Assurance Society of the United States. It is plaintiff’s statement that the examination was superficial. It did not include neurological or psychiatric examinations. The plaintiff, however, in answer to written questions relating to previous illness, answered the question “Have you ever been in any hospital, asylum or sanatorium for observation, treatment or an operation ? (State when, and where, and for what reason.) ” as follows: “Malaria, 1943 Jan Guadalcanal.”
He further answered concerning malaria that he had had six attacks from January to December 1943, that the duration of the attacks was a few days and that he had had no attack since December 1943.
As a result of the application and the examination referred to above, a $5,000 life insurance policy was issued by the insurance company, on which premiums were paid until March 18, 1949. The insurance continued until October 28, 1953, under an option for paid up extended insurance. It lapsed thereafter because of non-payment of premiums.
*73 21. Plaintiff was admitted to tbe U.S. Naval Hospital, Betliesda, Maryland, on April 17, 1945, with a diagnosis of “Hernia, Inguinal, Indirect #2003.” The physical examination at the time of admission revealed no significant defects other than hernia. Plaintiff underwent an operation for repair of the hernia on April 20,1945. He was discharged to duty on May 21, 1945, having been found “fit for same.”
However, it should be noted that unusual care was given plaintiff both before and after the surgery on account of his “latent malaria” evidenced by “8 malarial relapses” and that plaintiff was given no neurologic or psychiatric examination.
22. There is evidence that the plaintiff, in May 1945, was given some experimental drug. The kind and amount are not shown but he stopped its use after completing two-thirds of the dosage because he developed headaches which persisted for six weeks.
23. On June 15,1945, the plaintiff was given an eye examination at the Naval Dispensary, Navy Department, Washington, D.C. for which eyeglasses were prescribed and fitted.
24. On June 16,1945, during the period of plaintiff’s complaint of headache, an electroencephalogram (hereinafter EEG) on the plaintiff was requested by a Dr. Williams (a Navy doctor not otherwise identified). This EEG was accomplished by Dr. Eobert Cohn of the Neurology Department of the Bethesda Naval Medical Center and is quoted in full as follows:
6-16-45: Facial tremors. Cooperative.
Electrodes are placed along symmetrical para-sagittal lines over each cerebral hemisphere in the frontal, parietal and occipital regions.
The record is characterized by a low voltage random frequency pattern. Some approximately 9 per second activity is seen in all leads. Short sequences of 6 per second waves are seen in a general distribution.
Hyperventilation definitely accentuates the slow wave output.
Impression: GENEEADIZED ABNOEMAL EEG.
*74 25. On June 25, 1945, the plaintiff was admitted to the U.S. Naval Hospital, Bethesda, Maryland, where he remained until July 27,1945. His admitting diagnosis was “No Disease (Headache) #2143.” However, by July 13, this diagnosis was changed to “Asthenia Postinfective,” and the reason for the change was indicated thereon as “error” in the earlier diagnosis. During the period of this hospitalization, the plaintiff -underwent many physical examinations and clinical tests, and was the subject of several consultations, the results of which were recorded as follows: [Emphasis supplied throughout]
P.E.: Blood pressure 145/90. Eyegrounds negative except for tortuous arterioles, pupils OK. No lymphaden-pathy. E.E.N.T.- — negative. Lungs — clear[.] Heart and abdomen are negative.
6-26-45: Patient continues to complain of frontal headache requiring codeine and aspirin for relief. Lumbar puncture performed. Spinal fluid clear. Initial pressure 110 mm. water. Prompt rise to 150 mm. following compression of left jugular[.] Similar findings on right.
6-26-45: C.B.C. is normal.
6-86-45: Blood sedimentation: 7 mm. per hour.
6-86-45: Stool: O. and P. Helminths and Protozoa are negative. Occult blood: Positive (4 plus).
6-86-45: Smears for malaria: No malarial parasites found.
6-87-45: Spinal Fluid Examination: Kahn, Kolmer and increased globulin are negative.
6-87-45: Spinal Fluid Examination: Bed cell count per cubic mm. 1. White cell count per cubic mm. 1.
6-87-45: Blood Kahn is negative.
6-87-45: Malaria smear: No parasites found.
6-88-45: Urinalysis: B. and M. Albumin and sugar are negative. Occult Blood positive, 3 plus reaction.
6-88-45: Spinal Fluid Chemistry: Glucose 60 Mgs.% Chlorides 730 Mgs.% Proteins 16 Mgs.%
6-89-45: Smear of malaria: No parasites found.
6-30-45: The gastrointestinal disturbance of which the patient is conscious undoubtedly is of functional origin. *75 Possibly the headaches are likewise of similar origin, but the onset so soon after the administration of a new drug and the electroenchephalographic abnormalities cannot be passed over. Will check the latter. Also will get N.P. opinion.
7-%~45: Stool: O. and P. is negative.
7-5-45: Electroencephalogram again shows minor abnormalities but somewhat less than was noted previously. Headaches continue. There is an evident mild anxiety reaction on the part of the patient concerning his physical condition and he states definitely that this antedated the taking of the experimental antimalarial drug. Were it not for the EEG changes, would be inclined to believe that the headaches were psychogenic in origin. (They began on the day he returned to his job, which has been somewhat distasteful to him.[) ] The patient feels that he would be greatly benefitted by convalescent care, and would be inclined to agree if the neurologist feels that no other treatment is necessary and the malariologist feels that no antimalarial therapy should be given now.
7-8-45: Electroencephalogram: Generalized abnormal EEG. {Moderate). No marked change from record of 6-16-45 except that there is less slow activity in the present “spontaneous” run.
7-11-15: Patient is feeling better in that his headaches now are minimal. Had Eorschach test today. To see neurologist for opinion concerning the significance of EEG changes. The prevailing opinion now is that he should be transferred to convalescent hospital in Ash[e]ville for a period of rest.
7-11-45: Eorschach Test: The Eorschach shows extreme reduction in quantity of answers. This to a considerable extent invalidates the evaluation. There were two possibilities from such material as was given. The first is that there is a definite energy upset [.] The record with poor quality of response, tendency to give up and reject cards, ceneremphasis on popular answers and the incompatibility of quality and production with the subjects abstraction ability and level of achievements together with a definite color and shading shock ceneremphasis on wh[o]les seemed reaction time, intraversive experience balance lead to the impression of neurasthenia with a compulsive coloring. In the second aspect of the record there are a number of factors form variability, poor relation of concepts to bl[o]t areas, apparent disphoria, *76 vague confabilatory and even contaminatory trends) [sic], all of which suggest some generalized organic brain disturbance.
C& 7-13-45: Diagnosis changed this date by error to EC Asthenia Postinfective #2169. D.N.E.P.T.A. Not 18 misconduct.
7-17-lp5: Neurological Consultation: Examination fails to reveal any neurological findings that might shed any light upon the bases of his complaints. The feeling is that his EEC abnormality antedated both the taking of the experimental drug and his malaria, and probably is not related to either.
Th[ese] complaints are not unlike those following minor head injury, ie. so called “post concussion syndrone”. If it were known whether the complaint is of organic origin we would have some bases for deciding whether this patient’s symptoms are psychogenic or organic. The Borschach is not at all conclusive in this case. Begardless of any organic intracranial lesion he may have, [sic] He manifests a definitely neurotic reaction and attitude, both of which merit tense psychiatric attention.
7-17-l¡S: Although it seems to be agreed that a good part of this man’s disability probably is psychogenic in origin, the fact that he has had cerebral malaria and has changes in his electroence'phalogram carmot be ignored. The patient is anxious to have the opportunity of attempting physical and mental rehabilitation in a convalescent hospital. This would seem to be a logical request. If he returns improved, he can be returned to duty. If he is not improved, psychiatric opinion will be sought. Orders for transfer to USNH, Ash[e]ville, N.C. requested.
T 7-27-45: Transferred to U.S. Naval Special Hos-14 pital, Ash[e]ville, N.C. for further treatment and convalescence.
/s/ B. P. McCombs

Lieut. {MO) Ü8NB.

Approved:
/s/ C. L. ANDBEWS Oomdr. {MO) U8N.
By direction.
26. From July 28,1945, until January 1,1946, the plaintiff was a patient at the U.S. Special Hospital, Asheville, North *77 Carolina. This was a convalescent hospital, and plaintiff was not subjected to any of the ordinary duties and pressures of duty status while he was here. According to Dr. Norman E. 'Shumway (one of the Navy doctors who was on duty there at the time, and who testified in this case after the allowance of the plaintiff’s motion for rehearing), it was largely a place where you could come and sleep and eat. The plaintiff was not given any particular medical treatment at the hospital, the staff of which had no neurologists or psychiatrists. Dr. Shumway recalled the plaintiff very well when he testified on September 3,1966. He testified as to the plaintiff’s activity and to some extent his condition while there, as follows:
* * * This was a very informal convalescent hospital. The majority of the men there were enlisted men, Marines, young Navy enlisted men. There were a few officers. The convalescent part of it you could almost put in quotes, it was largely a place where you could come and sleep and eat, look after yourself as you pleased, and as I recall, Merson was on convalescent leave once or twice during the time that he was there in the hospital.
However, because of the fact that there were a very limited number of officers, I and Mrs. Shumway had gotten to know Commander Merson, because he was an extremely interesting and intelligent man. He used to come to the house very often because there was not a damn thing for him to do at the hospital, and he would come down and spend the evenings at our home with us, and we would feed him occasionally. He was underweight and he appeared to be somewhat tense when he first came there. He certainly was an interesting man. And to this extent I did have more of a contact with him than I would with the ordinary patient at the hospital. This is one of the reasons why I remember him, or the incidents more clearly, because to be honest about it I can’t recall hardly any other individual that we had down there as a patient, from a personal standpoint. It was largely because both my wife and I found him, I would say, the most interesting man in Asheville at the time. We were strangers, and we were looking for somebody for intelligent evening conversation. He was a lot of fun and intellectually stimulating.
So that from the standpoint of giving an opinion about his intellectual capacity at the time, I didn’t examine him as a psychiatrist, but I can reflect what I *78 observed from fairly frequent contact with him, not just as a physician-patient but as a friend, and there were very limited social opportunities in Asheville at the time. So that in this context I think I can’t separate the opinion that I might give from a medical standpoint from the observations that I had been making both as a physician theoretically in charge of him as a patient, but even more so an an individual of whom I was very fond and enjoyed his company.
$ ‡ $ 4-*
27. On October IS, 1945, the plaintiff, while a patient at the U.S. Naval Special Hospital, Asheville, North Carolina, appeared before a Board of Medical Survey. The report of medical survey ivas, upon completion, forwarded to and approved by direction of the Chief, Bureau of Medicine and Surgery, Navy Department, Washington, D.C. That report reads, in part, as follows:
Summary of case history:
This thirty-nine year old Lt. Commander was admitted to the U.S.N.H., Bethesda, Md. on 25 June 1945 under the diagnosis of No Disease (Headache) #2143. His headache had been present for six weeks prior to admission. On May 18, 1945, the patient had been given an experimental drug for malaria (which he acquired in Guadalcanal 1942-1943) and after completing two thirds of the dosage he developed a headache which persisted for six weeks. All laboratory tests were negative except E.E.G. which showed moderate abnormal changes which could not be interpreted. The Rorschach test was not considered conclusive in this case. At one time possibility of cerebral malaria had been considered. Diagnosis was changed to Asthenia Postinfective on 7-13-45. Reason Error. Patient was sent here with the purpose of rehabilitating him both mentally and physically. He has improved considerably.
The Board is of the opinion that further treatment is necessary.
ORIGIN: Is not the result of his own miscon-
(Is or is not)
duct and_was_incurred in line of duty. Ex-
(Was or was not)
isted prior to appointment or enlistment? No
(Yes or No)
*79 If “Yes,” was condition aggravated by service? Present condition Unfit for duty. Probable
(Yes or No)
future duration indefinite. Recommendation: That this officer be retained for further treatment.
/s/ P. G. Richards
P. G. RICHARDS,
COMDR. (MC) USNR, U.S.N.,

Senior Member of Board.

/s/ R. M. Dicosola
R. M. DICOSOLA,
LT. COMDR. (MC) USNR, U.S.N.,

Member.

/s/ N. P. Shumway
N. P. SHUMWAY,
LT. COMDR. (MC) USNR, U.S.N.,

Member.

28. On November 16, 1945, the plaintiff again appeared before a Board of Medical Survey ‘while a patient at the U.S. Naval Special Hospital, Asheville, North Carolina. The two senior officers of this Board of Survey were also members of the previous (October 15, 1945) Board (see finding 27). None of the members of this Board, however, was a neurologist or psychiatrist. The report which was submitted by the Board to the Chiefs, Bureau of Medicine and Surgery, Washington, reads, in part, as follows:
Summary of case history:
Reference is made to the previous medical survey submitted on 15 Oct 1945. The recommendation for further treatment was approved.
This patient was admitted to this hospital for the purpose of rehabilitation. Physical examination is essentially negative. Patient feels well, and is fully capable of assuming duty.
The Board is of the opinion that this patient is now physically able of asuming full duty.
ORIGIN: Is not the result of his own misconduct
(Is or is not)
and _was incurred in line of duty. Existed
(Was or was not)
*80 prior to appointment or enlistment? No. If
(Yes or No)
“Yes,” was condition aggravated by service ? _
(Yes or No)
Present condition Fit for duty. Probable future duration__ Recommendation: That he be ordered to full duty.
/s/ P. G. Richards
P. G. RICHARDS,
COMDR. (MC) USNR, U.S.N.,

Senior Member of Board.

/s/ N. P. Shumway
N. P. SHUMWAY,
LT. COMDR. (MC) USNR, U.S.N.,

Member.

/s/ M. L. Gray
M. L. GRAY,
LT. (jg) (MC) USNR, U.S.N.,

Member.

29. The finding of “fit for duty” by the second Board was made, according to Dr. Shumway, even though there was no substantial change in plaintiff between the October and November Board examinations. Dr. Shumway stated that there was a tendency for the doctors to overlook symptoms because of the pressures of the ending of the war and everyone wanting to go home. In addition, the hospital was scheduled to be closed in February or March of 1946.
30. On January 1, 1946, plaintiff was given a physical examination for the purpose of determining his fitness for promotion to the rank of commander, USNR. It was reported that plaintiff had been afflicted with “Malaria, Benign Tertian, last episode May 1945. Post Malarial Asthe[n]ia and on sick list until 1-1-46.” Plaintiff was found physically qualified to perform active duty at sea or on foreign service and for temporary promotion to commander on January 1, 1946, by Doctors Shumway and Richards, the same two doctors who had participated in the Asheville Board examination only several weeks previously.
31. The plaintiff was ordered on January 2, 1946 to the U.S. Naval Personnel Separation Center, Washington, D.C., for separation (if qualified) from the naval service. In this *81 connection, lie was examined by a Board of three Navy doctors, none of which was a neurologist or psychiatrist. The report of physical examination by the Board of Medical Examiners contains, in pertinent part, the following findings. (It should be noted that since the Survey Board had just evaluated him and Bu Med had approved, there really was no apparent reason for a thorough examination in view of the other pressures) :
History of illness or injury — Cartilage removed from It. knee — 1938. Rt. inguinal hernia — 1916. Malaria — 1943. UCD.
* * * * *
Nervous system — neg
Romberg — neg Incoordination {gait, speech) — none Reflexes, superficial — intact, deep (knee, ankle, elbow) — intact Tremors — none
Serological tests {when required) — KAHN NEGATIVE
Abnormal psyche {neurasthenia, psychasthe-nia, depression, instability, worries) — stable—no symptoms of postinfective asthenia remains.
*: % if: if:
Remarks on abnormalities not otherwise noted or sufficiently described above — May 194[5] last recurrent attack of malaria.
*: if: if: if: if:
Findings and recommendations {as per Courts and Boards, when necessary) — Physically qualified for release from active duty.
Board of Medical Examiners:
/s/ CWS
C. W. SMITH,
CAPT. (MC) TJSN (RET.)
/s/ H. D. Collett
H. D. COLLETT,
COMDR. (MC) USNR.
/s/ F. Kraft for
P. MILLER,
LT. COMDR. (DC) USNR.
32. Plaintiff was released from active duty, incident to demobilization, on March 29,1946, following terminal leave. Although plaintiff entered the Navy in excellent health and *82 temperament, tibe person released from the Navy on March 29, 1946 as “fit for duty” was not, according to close friends the same man. One former Naval Academy classmate stated (Affidavit of Edward E. Lull, Captain, U.S.N.R. (Ret.), dated February 8, 1966) : “I saw him the first week in November 1945, shortly after my own return from Pacific duty. Having learned that he was at the Asheville Naval convalescent hospital, I went to visit him for several days. Upon seeing him, I was deeply shocked. There was a startling change in his appearance, attitude and speech. I found a wan, sallow, aging, somewhat stooped person, an incredible transformation from, the former almost perfect physical specimen. He had a pronounced tremor of his head. The spring in his step was gone, instead, he shuffled. There were large dark rings under his eyes and there was a haunting look in them. They would burn with a lustre for a short time and then abruptly fade into dullness. In like manner, his speech would erupt in outbursts and then suddenly fade away, at times in the middle of a sentence or thought. His thinking was unclear and he was unable to stay with a topic for any length of time.”
33. Upon his release from active duty, the plaintiff was employed by the Electric Boat Company, Groton, Connecticut. Since he had been advised by many Navy doctors not to return to a tropical climate, plaintiff had resigned from the position which he had had prior to World War II with United States Steel Export Company in South America and from which company he had had an extended leave of absence for naval service. His employment with Electric Boat Company was terminated for health reasons in early October 1946, effective December 1,1946.
34. On October 10, 1946, the plaintiff filed an application for disability compensation with the Veterans Administration. In this application he stated that he was employed by the Electric Boat Company, Groton, Connecticut, but noted that he had “not been up to par physically for some time. Am resigning from this position effective 1 December 1946.” Replying to a question on the application form as to the names and addresses of all civilian physicians who had treated him for any illness prior to, during, or since his *83 (naval) service, the plaintiff stated “None — minor illness only prior to service. Self administration of treatment since leaving service.” He answered item No. 32 on the application as follows:

3%. Nature of disease or injury on accownt of which claim is made and date each began.

1. Malaria — Benign Tertian and malignant tertian beginning Jan. 1943. See Naval Eecord. Also several attacks at home — periodic attacks.
2. Hernia — April 1943 — See Naval Eecord.
3. Headaches & nausea — May 1945 — See Naval Eecord.
4. General Physical Malaise — Eecurrent [a]nemia — lack of energy, etc.
35. On April 2,4,1947, plaintiff was given a neuro-psychiat-ric examination by Dr. A. B. Musa, neuropsychiatrist, of the Veterans Administration. The report of this examination stated, in pertinent part, as follows:
Psychiatric examination: He is a courteous, friendly, sociable and pleasant appearing, middle-aged man, graduate of Annapolis and Harvard Law School. He cooperated well with the examination and freely entered into various phases of the illnesses that he had acquired while in the naval service. He gave an accurate chronological record of his past life. He showed some anxiety, apprehension and worry about his health. While discussing various phases of his malaria contact in Guadalcanal he was inclined to grow rather tearful and showed tremors of the head. Frequently during the examination his head tremor was noticeable when he was placed under stress and strain of questioning about the detail of his life. He expressed contentment in his marital life and that he likes his present work very much. He was appreciative of all the things that have been done for him thus far in the VA. He spoke well of everyone with whom he had come in contact in connection with his examination. He stated that he was not interested in compensation but he was advised to file a claim for the purpose of future security in case he finds himself disabled as [a] result of this present discomfort.
He said, “At times when I am tired I get pressure feeling over frontal head. This shaking of the head which I am conscious of. Occasionally at night I get attacks of shaking, especially with a tired feeling when I am pushed too hard physically. I have not *84 the stamina that I used to have. Occasionally, especially in summertime, I get a mild attack of fever and chill. I caught malaria in Guadalcanal January 194:3. At the last attack they told me I was out of my head, May 1948, because of high fever and malaria.”
Blood picture at this date reveals no malaria, [handwritten notation]
He is correctly oriented in all the spheres. He shows above average intelligence. No disorder found in his insight and judgment. He is making satisfactory social and industrial adjustment.
DIAGNOSIS: Anxiety neurosis.
On June 10,1947, plaintiff was awarded 10 percent disability compensation effective MareJi 30,1946, for “nervous condition following recurrent malaria.”
36. On February 3, 1948, plaintiff was given a neuro-psychiatric examination by Dr. Robert R. Levin of the Veterans Administration. The report of this examination reads as follows:
This 41-year-old married lawyer reports at the request of the Rating Board.
HISTORY: He was in good health prior to military service. He acquired malaria in Guadalcanal in 1942. [sic] While in Guadalcanal he apparently was run down from constant recurrent attacks of malaria. He lost 50 to 60 lbs.[1] Subsequent to this he was in the hospital for a total of about 18 months for his malaria and weakness. It was difficult to treat his malaria because he always vomited during the acute attacks. In May 1945 he [be]oame very ill after a few tablets of an experimental drug for his malaria. He was discharged from the Navy March 1946 by reason of demobilization.
Since discharge he has been in very good health. He has been eating well and maintains his weight. Occasionally he gets frontal headaches, generally when he is overworking. His wife has noted mat his head shakes at times when he is tired. He himself is not especially aware of this head shaking. He has been working steadily.
*85 NEUROLOGICAL EXAMINATION: He is neat, slightly tense and nervous. He is slightly over-talkative. He is well oriented and coherent. The cranial nerves are intact. The arm reflexes are equal and active. The abdominal and scrotal reflexes are equal and active. The knee jerks and ankle jerks are equal and active. Sensation and position sense are normal throughout. The Babinski is negative.
DIAGNOSIS:
1. No disease of nervous system. (In 1945 on two occasions electro-encephalograms were reported as abnormal.)
2. Anxiety reaction, slight — manifested by frontal headaches and shaking of the head. (In view of the 2 abnormal EEG in 1945, it was recommended that another EEG be done.) [This parenthetical statement was handwritten on the report.]
On April 13, 1948, plaintiff was advised that his claim for compensation benefits had been reconsidered, based upon the report of his examination of February 3, 1948, and that it had been held that no change was warranted in the previous 10 percent rating.
37. Appended to the neuropsychiatric examination conducted by the Veterans Administration on February 3,1948, was an electroencephalographic report of the same date. The impression reported by the examining physician was:
Impression: This record shows an abnormal amount of slow activity during hyperventilation. It seems, however, that this abnormality is somewhat related to disturbed sugar metabolism. This may be due either to a general somatic factor (liver insufficiency? adrenal insufficiency?), or to sequella of the previous encephalopathy. (Sugar metabolism and liver function tests should be performed.) It seems that the patient should remain under medical supervision. (Emphasis supplied.)
38. Obviously because the plaintiff was going on active duty training with pay, allowances and travel expense beginning the next day (which required him to state in writing that he was not drawing, nor did he have a claim pending for a pension, disability allowance or disability compensation— see defendant’s exhibit R, p. 66), the plaintiff, on August 31, *86 1949, addressed the following letter to the Veterans Administration:
Ke: Claim No. 8895 880
With regard to monthly compensation payments which I am currently receiving in connection your finding of Service Connected Disability resulting from malaria (benign and malignant types) incurred while on duty in the South Pacific in World War II, I hereby request that you discontinue, effective upon receipt hereof, further payments.
So far as I am able to determine my condition has not become aggravated and I find that I am able to earn a livelihood. So long as this condition obtains, I shall make no further claim for compensation.
Thank you for the equitable consideration which I have received from you.
39. Subsequent to his release from active duty on March 29, 1946, plaintiff served on active duty for training during the following periods:
September 1,1949, to September 14,1949,
June 11,1951, to June 24,1951,
May 12,1952, to May 25,1952,
June 12,1955, to June 25,1955,
May 6,1956, to May 19,1956,
November 4,1956, to November 17,1956.
Plaintiff was found to be physically fit to perform the duties of his rank at the beginning of each period of active duty for training, and to be physically qualified for release from active duty at the end of each period. Plaintiff also received high performance ratings from his superiors during these tours of duty.
However, in considering the probative value of these reports and examinations, several factors must be noted.
The duration of these tours of duty were only two weeks at a time. This is not equivalent to the obligations and pressures of a full-time job and hence is not an adequate base upon which to evaluate plaintiff’s physical and mental ability. A more accurate measure is plaintiff’s lack of success in the civilian job field at which he worked full-time during these years.
The physical examinations which described plaintiff as “fit for duty” must be characterized as perfunctory, at best. It is *87 relevant that no reports of examination were prepared, only-brief statements of conclusions. Many of these statements were not signed but stamped or left blank. The Navy Department, itself, in a Navy Circular of June 16,1952, specifically states that examinations for two-week tours are incomplete and will not be accepted in lieu of the quadrennial examinations required for members of the Keserve. The only quadrennial examination given the plaintiff, February 1959, showed that he was unfit for retention. In addition, there was uncontroverted testimony that at times, the papers showed physical qualification for the two-week training tours were signed by persons who had not even seen the individual evaluated. Finally, even if there had been thorough physical examinations they would have been inadequate to evaluate plaintiff without psychiatric and neurologic examinations of which there were none.
40. For six months following his release to inactive duty, the plaintiff was employed by the Electric Boat Company, New London, Connecticut. His earnings during this period were $700 per month. While the plaintiff has testified (in 1961) that he had told his employers at Electric Boat about his medical history, that he had been hired by Electric Boat on a trial basis, and that his employment was terminated on account of his health. This testimony is entirely substantiated by the other witnesses who were in a position to observe plaintiff about this time, such as Capt. Lull, David Merson, Dr. Shumway, Mr. Cooper and Mr. Moore.
41. After leaving employment with the Electric Boat Company, the plaintiff, from February 194-7 until the latter part of 1952, was employed by the Dixie Cup Company, Easton, Pennsylvania. His earnings for this period (salary and bonus) were as follows:
1947 $8,312. 53
1948 10,433. 36
1949 11, 541. 68
1950 12,541. 60
1951 15,289.41
1952 20,000. 00 (approximately)
At Dixie Cup Company, the plaintiff was responsible for setting up the law -and patent department of the firm.
*88 Mr. Hugh Moore, Chairman of the Board of Dixie Cup Company at the time of plaintiff’s employment stated:
“Merson’s education and apparent professional ability made him a likely person to be the staff lawyer for the company. It became apparent soon after his employment * * * that he was a brilliant man but with a nervous or emotional affliction which irritated his teammates. He had a physical impairment in that his hands trembled, and his head, which he held to one side, shook while conversing with others.”
“It was not long after his employment by ourselves that he became a problem notwithstanding the satisfactory discharge of his legal duties, as I recall. The time came when Mr. Dawson (the President, who befriended plaintiff, see para. 83a (13) below) and I decided that we must let him go, but Dawson was a good-natured person, and it took a year or more, as I remember, to complete the separation.
“I liked Merson personally, and reluctantly came to the conclusion that m our organization he was more of a liability than an asset.”
Mr. Moore’s statement that plaintiff “had a physical impairment in that his hands trembled, and his head, which he held to one side, shook while conversing with others” is corroborated by the documentary evidence because the tremors and psychiatric condition were observed by the VA in April 1947 and by Dr. Shumway in the fall of 1947 and the abnormal EEG in 1948.
Dr. Shumway, for example, describes plaintiff’s condition in the fall of 1947 as abstracted, disinterested, unable to concentrate entirely, unable to follow conversation, emotionally somewhat depressed, anxious, with tremors of the head and hands, a fixed facial expression with symptoms of Parkin-sonism and probably a diffuse encephalitis.
Plaintiff’s employment with Dixie Cup was terminated December 1, 1952. Plaintiff testified that Mr. Dawson, the President of Dixie Cup, had told him this decision was made because there were so many complaints and they had to ask him to leave to save their organization.
42. In November 1952, plaintiff had been out of work for three months when Dr. Robert L. Johnson, President of *89 Temple University asked plaintiff, who had done some volunteer work in behalf of the Hoover report (which consisted of spending a few hours a week attending luncheon and dinner meetings to raise money, with no participation in the preparation of the report) to help him raise money for the purpose of bringing the report up to date for the incoming Eisenhower Administration. The job lasted less than four months. He was given a small office at Temple where, with a secretary, he sent out many letters soliciting funds, prepared by a consulting firm.
43. Shortly after the inauguration of the President in 1953, the plaintiff accepted a position as special consultant to Dr. Robert L. Johnson, the newly appointed head of the International Information Administration of the State Department. He was active as special consultant (at $50 a day) to the head of this office, presently known as the United States Information Agency.
This job lasted approximately five months. Dr. Johnson has stated in an affidavit with reference to plaintiff during this period that after a month or two he [Dr. Johnson] realized that the strain of this job affected plaintiff’s handling of problems and relationships with other people; that plaintiff became very irritable and offensive but that plaintiff was of such fine character, idealism and loyalty that he would overlook these “idiosyncracies”.
44. Plaintiff’s next civilian employment was at Temple University, again with Dr. Robert Johnson. In his affidavit Dr. Johnson stated that he urged plaintiff to rest up after his five-months job as his consultant on the International Information Agency and then to come to Temple to help him raise funds in the development program of Temple University.
For this purpose, plaintiff was appointed vice-president. However, after approximately four months he was asked to resign and again Dr. Johnson urged him to take a complete rest. Plaintiff’s brother, David Merson, testified that Dr. Johnson advised him over the telephone that “to have kept Martin [plaintiff] on would have demoralized the organization”.
*90 45. From 1955 -until 1957, the plaintiff attempted to practice law in Philadelphia. He was not successful. His brother furnished the office, paid the rent and supported plaintiff and his family.
46. Plaintiff was unable to find other work, so in 1958 or 1959, he went to North Carolina and taught in high school for a school year at a salary of $3,000. He had to give even this up because it proved to be too difficult for him. Thereafter, he taught for a time in a college, where he was told that his work was completely unsatisfactory. He apparently has had no other employment thereafter.
47. On May 14,1957, the plaintiff applied to the Veterans Administration for reinstatement of his disability compensation, which, in 1949, he had asked to be terminated (so that he could obtain active duty training pay allowances and travel expense — see finding 38). The request was made because his ability to earn a livelihood was substantially impaired. An increase in percentage of disability was requested. In this application, the plaintiff listed the places (or most of them) where he received treatment for malaria while in the service. Under question 22, the plaintiff was asked on the application form to state the nature of disease or injuries for which claim is made -and the date each began. He answered as follows:
Organic impairment of central nervous system resulting from cerebral malaria[2] contracted while serving as executive officer, U.S. Naval Base, Guadalcanal, British Solomon Islands. Tremors, now steadily worsening, first manifested themselves soon after several severe attacks of malaria in 1943 following evacuation from Guadalcanal by Army hospital plane.
On the application referred to above, the plaintiff stated that he had not been treated by any civilian physician since his release to inactive duty.
48. On October 3,1957, the plaintiff was given a neurological and neuropsychiatric examination by Dr. I. Kotzin, a VA doctor with the Neuropsychiatric Division of the Phila- *91 delpbia VA office. The clinical record of such examination reads as follows:
Reference is made to the case folder for past records and history.
Veteran states that when he came home from service on a convalescent leave his wife had noticed that he was nervous but did not say anything to him. He describes how during that time his little child of whom he was very fond did something minor which did not please him. He picked this little girl up and almost threw it to the ground because of excess uncalled for anger. He emphatically states that this was not like him and that this had made his wife think that his nerves were not good any more. He states that after he was discharged from service his wife also noted that he was tense, noticed that he had a tremor of the head but she would not say anything to him because she did not want to make him feel badly. He says that he did not pay any attention to the tremor, no one had said anything to him and one of the Officials at Temple University where he was formerly a Vice President had made some remark that he is suffering from Parkinsonism. However, he tries to indicate that all his associates never told him about the tremor and his wife never told him about it because she did not want to worry him. He states that he was always tense since discharge from service, did not feel well but he kept on going because he was able to manage. As a matter of fact he had rather important jobs as is noted on VA Form 2545 in paragraph 14a. He states that he did not try to press a claim for compensation of any degree because he was able to work despite the fact that his symptoms became gradually worse. However, in May 1957 the symptoms reached such peak as that he was not able to do any work whatsoever and [has] not even gone into his Law Office to do anything. Therefore since May 1957 this veteran, who had been practicing as an attorney in Philadelphia since January 1955, has done no work whatsoever. He states that he has the will, the drive and the force to work but he is not feeling well, and therefore cannot do anything.
He describes himself as being extremely nervous and by this he means he is high strung, tense, is easily excited, is irritable, has a tremor of the voice, tremor of the head, his writing is tremulous and suffers from insomnia. He states that he has headaches but not any more than any other individual.
*92 This veteran is of fair development and nourishment, neatly dressed, is extremely polite, courteous and attentive. He give[s] me the impression of being a very intelligent individual and seems to be sincere. The trem- or of Ms voice is obvious but at times tMs disappears. As far as the head and handwriting is concerned this will be discussed in the neurological examination. Affect is normal, mood is one of depression and tension. During the interview this tension seems to vary in intensity but his preoccupation and depression is quite obvious all the time. Sensorium is clear, general judgment is good.
Neurological Examination: Positive Findings — Veteran keeps his head to the left[,] something that he never did before. However he is able to straighten up his head, rotate his head from side to side in an equal force. There is a side to side tremor of the head at times nodding but this also varies in intensity during the interview. It seems that when we tried to have him do sometMng the tremors increased. His handwriting is rather sprawling in nature, though he may have had poor penmanship all the time. However, judging from the case folder Ms handwriting has become more [illegible] and there is an indication of tension. He holds the pen tightly in order to write. Fingers of the extended hands are tremulous. At rest the hand is tremulous but by no means present all the time. He is normally right handed but yet the grip of the left hand is a great deal stronger than the right, however, it should [be] mentioned that the grip of the right hand is not weak by any means. However, in comparison this may be of significance. Otherwise there were no pathological findings, there was no obvious disassociation of movements, no cogwheel rigidity, facial expression was not vaceous, etc. The most important obvious feature was the tremor of the head.
Industrial Adjustment Reference is made to paragraph 14a on VA Form 2545 which was completed by the veteran. He has had important jobs in the past. From October 1953 to December 1954 he was Vice President of Temple UMversity and his job was to build up the Undergraduate School. However, because of some disagreement in the administrative personnel he decided to quit and went into Law Practice in January 1955. Since May 1957 veteran has not gone into his office because of the way he feels.
Social Adjustment Veteran has always had an active social life because of the type of work he has done. His *93 wife died only two days ago. He tells me definitely that she went into the hospital two weeks ago and before then did not complain because she was the type who did not like to go to doctors. He now has 2 children. Since May 1957 Ms social life has been null because of his nervous condition.
Comment This veteran had malignant tertian malaria in service. On May 18,1945 he was given an experimental drug for malaria which he acquired in Guadalcanal from 1942 to 1942 [sic] and after completing %rds of the dosage he developed a headache which persisted for 6 weeks. All laboratory tests were negative except EEG which showed moderate abnormal changes which could not be interpreted. At one time the possibility of Cerebral Malaria [see footnote 2 above] had been considered. However the diagnosis was changed to “Asthenia Post-Infective”. It is also interesting to note that there is a “special examination and treatment” sheet from the Navy dated June 15, 1945 in which it states “6-16-45; Facial Tremors cooperative, generalized abnormal EEG”. Why he should have had facial tremors at that time is not explained. Today he has tremors of the head. Whether there is a relationship of the head tremors today to the facial tremors described above one cannot state because the records are not too complete. Plis handwriting is somewhat tremulous and he has to hold the pencil very tightly. There may be a possibility that he has Parkinsonism without the rigidity but at this time I do not feel that this diagnosis is justified, though it certainly should be kept in mind. It is also important to realize that on two occasions he had abnormal EEG’s in service, though later the EEG was normal. He refuses to go to a hospital for observation at this time because of the recent death of his wife. There is no doubt that this veteran is badly in need of treatment and he has completed a form out today to receive treatment at the Mental Hygiene Clinic.
Diagnosis Anxiety Reaction, moderately severe to severe, associated with depressive features and tremors of the head and hand. (See Comment)
49. On October 21, 1957, the VA advised the plaintiff by letter as follows:
Your disability compensation claim was carefully reviewed on the basis of all evidence of record including a report of your resent physical examination.
*94 It has been determined that your service connected nervous condition was 10% disabling to October 2,1957 and 50% disabling from October 3,1957.
You had previously renounced your disability compensation and reopened your claim on May 15,1957. On the basis of the present evaluation of your disabilities action has been taken to resume payment of disability compensation in the Amount of $17.00 monthly from May 15, 1957 to September 30, 1957; $19.00 monthly from October 1,1957, reflecting the increase granted by an act of congress and $100.00 monthly from October 3, 1957.
The law provides that a veteran is entitled to receive additional compensation for dependents if his disability is rated as 50% or more disabling. Accordingly, you are requested to submit as soon as possible the birth records of your children.
50. At the urging of his wife, before her death in 1957, and of his brother, the plaintiff for the first time since his release to inactive duty from the service, went to a private physician complaining of his physical condition. The plaintiff was hospitalized for the purposes of a complete physical and neurological evaluation, and the doctors who made it submitted written reports. The plaintiff consulted Dr. William M. Hitzig, a highly qualified specialist in internal medicine, who in turn called in two eminent neurologists to conduct the neurological part of the examination. Dr. Daniel S. Feldman, one of the latter, submitted his report to Dr. Hitzig, who incorporated it into his own report in the form of an affidavit of November 9, 1957. The reports of both doctors named above read as follows:
William; M. Hitzig, M.D.
787 PARK A.VENTTE
New York 21, N. Y.
Regent 7-2220
November 9, 1957

To Whom It May Concern:

Mr. Martin Merson, of P.O. Box 853,. Paoli, Pa., was hospitalized by me at The Mount Sinai Hospital, New York, N.Y., from July 16th, 1957, to July 18th, 1957, for the purposes of a complete physical and neurological evaluation. His general physical examination showed *95 moderate generalized asthenia but was otherwise not remarkable. His neurological examination showed him to be irritable and restless, to have a nodding tremor of the head and face, reduced to absent associated arm swung and a suggestion of increased rigidity of his extremities.
In order to gain a complete understanding of Mr. Merson’s condition, his entire health record of his active naval service was reviewed. According to the patient and confirmed by his record, he was in his usual state of good health until approximately January, 1943, when he was stationed in the Solomon Islands. At that time, he had the first of several bouts of fever of unknown origin which by April and May of that year were diagnosed as vivax and falciparum malaria. With the last of these attacks in May, he lost consciousness and had to be evacuated from the area. According to the patient, his memory for the events of two to four weeks following the episode in May was absent or severely impaired. Following his return to the United States, several hospitalizations were required for recurrent malaria. The patient and his family noted that there had been a gradual personality change with irritability, easy anger, and generalized asthenia. These symptoms continued to be present and in 1945 he was hospitalized on two occasions and examined at the U.S. Naval Hospital, Bethesda, Md. It is significant to note that several electroencephalograms were reported to be abnormal and that on one of them the report includes a comment that facial tremors were present. The patient’s asthenia and irritability continued following his discharge from active naval service and approximately in 1953 tremors of the voice, face and head appeared and have been increasingly prominent since.
During his hospitalization at The Mount Sinai Hospital, Mr. Merson was seen and examined by Dr. Morton Nathanson, Associate Professor of Neurology, New York University, and Associate Attending Neurologist, The Mount Sinai Hospital, and by Dr. Daniel S. Feldman, Clinical Assistant of Neurology, New York University., and Assistant Attending Neurologist, The Mount Sinai Hospital, New York, N.Y. Both Dr. Nathanson and Dr. Feldman made a diagnosis of extrapyramidal disease secondary to an acute encephalitis which the patient had in 1943. Dr. Feldman’s sworn statement is attached to this report and it was his opinion that at the time of Mr. Merson’s release from active duty he was not fit for duty.
*96 A careful personal evaluation of the facts in this case point out to me that Mr. Merson suffered an acute personality change with this illness in 1943; the major characteristic of the 1943 episode was the acute and severe disturbance of consciousness. Asthenia and personality change have continued to be present since the episode. He has developed at the age of approximately 47 an extrapyramidal syndrome. This Parkinsonian picture is of the type seen following encephalitis because of the patient’s age and previous history and lack of family history of similar dysfunction.
Therefore, in consideration of all the facts in Mr. Merson’s case, it is my opinion that:
(1) Mr. Martin Merson was not fit for duty at the time he was released from active naval service in 1945.
(2) The disability that rendered him unfit for duty at that time was encephalitis, acute, with post encephalitic phenomena.
(3) The sequelae of the encephalitis have continued to be present and have produced increasing symptoms and disability.
(4) His present complaints are the result of an illness incurred in the line of duty, not due to his own misconduct.
(5) The defects and disabilities will not only continue to be present throughout the remainder of his life, but may be sufficiently progressive to cause eventually permanent and complete invalidism.
/s/ .
. William M. Hitzig, M.D.
WMH/jfm
[Dr. Hitzig’s statement was acknowledged before a notary public on November 14,1957.]
DANIEL S. FELDMAN, M.D.
2 EAST NINETY-SECOND STREET
NEW YORK 2 8, N.Y.
LEhigh 4-6116
October 30,1957
William M. Hitzig, M.D.
787 Park Avenue
New York, N.Y.
My Dear Doctor Hitzig:
The following is a report of the Neurological evaluation of your patient, Mr. Martin Merson, P.O. Box 853, *97 Paoli, Pennsylvania. Mr. Merson was hospitalized at The Mount Sinai Hospital, New York, July 16-18,1957, and was seen and examined there. Pie has made available to me photostats of his entire Health Eecord during his period of active Naval Service.
According to the patient, and confirmed by official entries in his health record, Mr. Merson was in his usual state of excellent health until January 1943, when he was stationed in the Solomon Islands. At that time he had the first of two bouts of fever of unknown cause. The second occurred in March. On April 1, 1943, according to his records, he was admitted to the sick list with a diagnosis Malaria, tertian, vivax type, and discharged April 4, 1943, with three sick days. No clinical details of this illness are in the record. On May 3,1943, he was again admitted to the sick list, at this time with a diagnosis Malaria, tertian, falciparum type, and transferred from the area after three sick days. Again no clinical data are available; however, his health record was endorsed “Not Returnable to a malarial area”. He had a 5-day journey to U.S.N. Mobile Hospital #4 on board the U.S.S. TRYON. Aside from a note that he was “very apprehensive”, and that he continued to have fever and required IY medications this report is unrevealing. At the mobile hospital his examination is reported to show him acutely ill and weak. No note is made as to his mental or neurological status. He was subsequently transferred to USNH San Diego, California, arriving there May 30,1943.
According to the patient at the time of his illness which necessitated his hospitalization he lost consciousness. He hadj and still has an absolute amnesia for the first five or six days of this illness. The subsequent two weeks are a source of confused and uncertain memories. His first distinct recall is toward the end of the voyage back to the United States. The medical records are neither confirmatory nor denying of this state of affairs; this is quite understandable as these records were made under combat conditions, and were at the time quite sufficient for the purposes of identification and treatment of the patient. A number of subsequent hospitalizations and evaluations are noted in the records available. In general, Mr. Merson continued to complain of easy fatiguability [sic] and loss of strength, and states that his wife and members of his family noted at this time and subsequently that he had undergone a distinct personality change; whereas prior to his illness he was calm *98 and eventempered, lie became irritable, irascible and restless. The patient states, that although he did not feel that he was completely well, as his improvement during his convalescent hospitalization did not continue to occur, he requested administrative action which would return him to some sort of useful activity in the Navy during the war. In January, 1944, he was noted to be qualified only for limited duty at the time of an annual physical; no reason is given. In June, 1945? he was hospitalized at USNH Bethesda with complaints of headache. No Neurological abnormalities were reported. However, an electroencephalogram report notes facial tremors to be present on June 16, 1945, and the report shows diffuse abnormality to be present. A subsequent EEG dated July 3, 1945, is again abnormal, although less so. A Rorschach test during his hospitalization was likewise suggestive of organic cerebral dysfunction.
In December, 1945, he was released from active duty and returned to civil life. He continued to feel -weak, tired and irritable and in December, 1946, made application to The Veterans’ Administration for and received a disability benefit rated at 10%.
His present complaints are of generalized tremors, change in his voice, appearance and alteration in his handwriting. These date back at least two years and have been progressively present since their onset. The patient states that in addition to these complaints which he has noted, the personality changes which occurred following the acute illness have never abated and that people have noted from time to time prior to and since leaving the service, that his face was “altered” and as early as 1953, that the tremor of the face was quite pronounced. The Neurological examination showed no specific abnormality of the mental status. The face was somewhat fixed, and expressionless, blinking was infrequent, there was a moderate tremor of the lips and tongue and his voice was tremulous. A side to side tremor of the head was noted. Associated arm swing was markedly reduced, his attitude was stoop-shouldered, and an intermittent alternating tremor of the hands was present. Mild increase in tone was diffusely present. His handwriting was small and'irregular. No festination was noted, nor was there any marche-a-petits pas. Amplitude of rapid alternating movements was decreased. Myerson’s sign was present. No abnormalities of sensation nor of the reflexes were *99 noted. Examination of the CSF was within normal limits; an EEC was reported as a normal record.
The present picture is that of an extrapyramidal syndrome of the Parkinsonian type, in a young man (for this disorder) with no family background of such disorder. This disease process appears to be post-encephalitic. The patient gives a clear-cut history of a febrile illness with a severe disturbance of consciousness, followed by a prolonged period of memory disturbance, and upon recovery asthenia and personality change, abnormal EEG’s and then the development early in life of extra-pyramidal disease. The nature of the etiologic agent is not clear; the identification of the malarial parasites is conflicting and in an area where malaria is endemic other diseases than malaria may be present in an infected individual. It is unfortunately many years since the acute episode so that diagnostic investigations are of somewhat limited value in establishing an exact etiology. The clinical picture is that, however, of acute encephalitis and post-encephalitic phenomena.
For these reasons I believe that Mr. Merson was not fit for duty at the time that he was released to inactive duty from the Nava] Service.
Yours sincerely,
DANIEL S. FELDMAN, M.D.
DSF :MCW
51. By application received by the Board for Correction of Naval Kecords, on January 6, 1958, plaintiff for the. first time requested that he be granted physical disability retirement pay effective March 29, 1946, the date he was released from active duty. In support of the application, plaintiff submitted the following:
(al My entire naval health record
(b) My entire naval record
(c) My V.A. File No. listed as C 389 5880
(d) Statement by Dr. Daniel S. Feldman, dtd. Oct. 30, 1957
(e) Statement by Dr. William M. Hitzig, dtd. Nov. 9, 1957 .
52. The medical statements submitted by plaintiff in support of his application wore referred' by • the Correction Board to the Chief, Bureau of Medicine and Surgery, for *100 opinion and comment. The reply dated March 24, 1959, was as follows:
BUMED-3131-RSH :ek
MERSON, Martin
62081
24 March 1959
From: Chief, Bureau of Medicine and Surgery
To: Chairman, Board for Correction of Naval Records
Subj: MERSON, Martin, CDR, USNR, 62081; advisory opinion in the case of
Ref: ) BCNR Itr BE :vrw dtd 9 May 1958
Enel: (1) BCNR file on subject officer
(2) Medical Record of subject officer
(3) Officer File (2 parts)
(4) Fitness Report Jacket of subject officer
1. In accordance with the request contained in reference (a), the following advisory opinion is hereby submitted.
2. A careful review of enclosures (1) through (4) indicates that CDR Merson was originally hospitalized 27 January 1943, U.S. Naval Base, Lunga, Southwest Pacific with the first of five successive attacks of Malaria, Malignant, Tertian. On 15 May 1943, he was transferred to the United States for further treatment and convalescence, suffering periodic attacks of Malaria to 20 December 1943. On 22 April 1944, he was found physically qualified for promotion to Lieutenant Commander but one month later was again hospitalized for persistent headaches that were diagnosed as Asthenia, Postinfec-tive. Following an intensive mental and physical rehabilitation program, CDR Merson was found physically fit for full duty status and on 1 January 1946, he was found physically qualified for promotion to Commander, USNR. One day later, 2 January 1946, petitioner was found physically fit for release to inactive duty.
3. Further, it is noted that CDR Merson has been found physically qualified to perform the duties of his rank for six, two-week periods of active duty, the last being in November 1956. Also, a review of his numerous accomplishments in the civilian business world indicate the pressure of a sustained, lengthy, and vigorous pursuit of his vocational interests.
4. Accordingly, it is the opinion of this Bureau that there is no evidence of record to suggest that CDR *101 Merson’s physical condition at the time of his release from active duty, or subsequent thereto for several years, was anything but fully qualified.
E. C. KENNY
Assistant Chief for Personnel and Professional Operations
53. A copy of the reply of the Chief, Bureau of Medicine and Surgery, dated March 24,1959, was forwarded to plaintiff’s counsel for comment and any rebuttal deemed necessary. In reply, plaintiff filed with the Correction Board a voluminous brief which is plaintiff’s exhibit 5 in this case. The Correction Board, on June 9, 1959, forwarded the rebuttal brief and the entire record in the case to the Chief, Bureau of Medicine and Surgery, for review, comment and recommendation. The reply of the Chief, Bureau of Medicine and Surgery, stated as follows:
BUMED :3131:ek
MERSON, Martin
62081
6 July 1959
From: Chief, Bureau of Medicine and Surgery
To: Chairman, Board for Correction of Naval Records
Subj: MERSON,. Martin, CDR, USNR, 62081; advisory opinion in the case of
Ref: (a) BCNR ltr BE :vrw dtd. 9 May 1958
(b) BuMed ltr BUMED :3131 :RSH :ek dtd 24 Mar 1959
(c) BCNR ltr BE :jas dtd 27 Mar 1959
(d) BCNR ltr BE :ew dtd 9 June 1959
Enel: (1) BCNR file
(2) BuMed file
(31 Officer file (2 parts)
(4) Fitness Report Jacket
(5) Petitioner’s Brief filed 8 June 1959
1. By virtue of reference (a), enclosures (1) through (4) were forwarded to this Bureau, requesting an advisory opinion as to the medical merit of subject’s original petition. It was CDR Merson’s contention that his Navy records should be corrected to show a physical disability separation from the service in 1946, rather than a release to inactive duty.
*102 2. It was the opinion of this Bureau, as reflected in reference (b), that such a petition had no medical merit and it was concluded that CDR Merson’s separation from active duty on 2 January 1946 was entirely proper under the then existing rules and regulations.
3. The above stated Bureau of Medicine and Surgery advisory opinion was transmitted by reference (c) to the petitioner and his legal representatives for their comment and substantiation. Such comment, as contained in enclosure (5), was forwarded by reference (d) to this Bureau for a further medical advisory opinion.
4. Review of enclosure (5) indicates it to be a rather lengthy, categorized summation of pertinent data gleaned from enclosures (1) through (4), and does not present any additional evidence in support of the original petition. Navy medical records show very clearly that CDR Merson contracted a severe case of malaria while serving on Guada [1] canal in 1943. Moreover, the records of evidence also indicate that at the present time petitioner is incapacitated by the progressively destructive processes of an extrapyramidal disease, secondary to an acute encephalitis incurred in 1943; hence a service-incurred physical disability.
5. However, this is not sufficient cause for consideration of disability retirement benefits or severance pay as provided by the laws administered by the Navy Department. As the enclosures reveal, such service incurred disability may afford eligibility for compensation under laws administered by the Veterans Administration. The crucial factor in making a determination as to which laws are applicable is found in the determination of physical fitness for duty at the time of release from active'duty. Here, enclosure (5) deviates from its factual presentation of evidence and presents only an opinion as to CDR Merson’s physical fitness for active duty as of 2 January 1946, the date he was released to inactive duty. On pages 103 and 104, enclosure (5), petitioner attempts to discount the Navy findings of “fit for full duty” on 16 November 1945, and “found physically qualified for temporary promotion to Commander, USNR,” on 1 January 1946, by minimizing the professional stature of the U. S. Naval Special Hospital, Asheville, North Carolina. Some philosophy regarding the impending end of the war and the need to unload all patients is not considered ample evidence that a board of fully qualified Navy physicians erred in finding subject petitioner fit for duty. Further, the reviewing board of equally well qualified *103 physicians in this Bureau concurred in these findings, and the subsequent six tours of two-weeks training duty presents ample medical testimony that CDB. Merson was in fact, fully qualified physically to perform all of the duties of his rank at the time he was released from active duty, and for some time thereafter.
6. In view of the above, it is the continued advisory opinion of this Bureau that subject petition has no medical merit and that CDB Merson is not entitled to disability retirement or severance pay.
/s/ EUGENE Y. JOBE
Eugene V. Jobe
Director, Professional Division
54. By letter dated July 30, 1959, the Correction Board advised plaintiff, as follows:
Beference is made to your application for correction of your naval record, under the provisions of Title 10 U.S.C. 1552.
Administrative regulations and procedures established by the Secretary of the Navy for the guidance of this Board provide that the burden of proof is on a Petitioner to show by documentary evidence that an error has been made, or an injustice has been suffered. Further, a hearing by the Board may be denied when a Petitioner has failed to show that an entry or omission in his naval record was improper or unjust under then existing standards of naval law, administration, and practice.
Preliminary examination of your naval record and review of the material submitted by you fails to establish a sufficient basis for further action by this Board. In this connection, you are informed that your detailed brief was reviewed by the Board together with all other documentary evidence of record.
Although your physical condition today may be of such disabling degree as to warrant retirement for physical condition if you were on extended active duty now, your condition at the time of your release from active duty in 1946 is of primary consideration. Becords show that you served on six tours of two-weeks’ training duty subsequent to 1946 with no indication that your admittedly service-connected disabilities rendered you unfit.
It is not the intention of the Board to imply that a subsequent review of your case may not be had. As stated *104 above, however, the burden is on you to show that an error or injustice has occurred.
In the absence of additional material evidence, no further action on your application is contemplated.
Sincerely yours,
/s/
CHARLES E. CURLEY
Executive Secretary
By direction of the Chairman
55. On August 11, 1959, plaintiff’s counsel sought additional information regarding the proceedings of the Correction Board. The reply was made on August 14, 1959, as follows:
My dear Mr. King:
Reference is made to your letter of 11 August 1959 relative to the case of Commander Martin Merson.
In accordance with your request, there is enclosed herewith a copy of a letter dated 6 July 1959 from Chief, Bureau of Medicine and Surgery.
You are informed that there are no proceedings in the case since the Board, by unanimous vote, denied the request for a hearing. In arriving at this decision, the Board considered not only the aforementioned letter but also all other evidence of record including the extensive brief filed on 8 June 1959 by you in Commander Merson’s behalf.
Sincerely yours,
/s/ F. W. BREW
Assistant Executive Secretary
56. No further evidence was presented to the Board for Correction of Naval Records.
57. Thereafter, the plaintiff was again given a neuro-psychiatric examination on December 17, 1959, by Dr. I. Kotzin (of the Veterans Administration), who had earlier made such examinations of plaintiff. The clinical record of such examination made by Dr. Kotzin reads as follows:
The case folder was reviewed.
Veteran complains of tremors of the head which he is unable to control. It is aggravated by tension and when he has to “call on my physical and mental facilities”. He *105 also states that his handwriting is tremulous and when writing he has to hold the right hand with the left very tightly. Because of this he writes very little.
He also complains of irritability, easily excited, feelings of tension and depressive spells.
He states that he was studied at the Mt. Sinai Hospital in June of 1957 and has been taking anti-Parkinsonism drugs for several years, approximately seven years.
He is a fairly well developed and well nourished individual, very polite, very neatly dressed, cooperative and attention is easily held. He talks in a loud tone of voice clearly with an element of conciseness, and in addition there is an inkling of a tremulous quality to the tone of his voice. He is coherent and relevant and quite voluble when he discusses his present plight. No psychotic ide-ation can be elicited. He impresses me as being a perfectionist, emotionally unhappy, anxious and tense. One can readily see that he would be prone to depressive episodes because of his inability to carry on with his profession as a lawyer. Affect is within normal limits. His head is practically in a constant coarse tremor except for periodic momentary relief. It should be stated that veteran feels “at home” during the interview as he has always been most appreciative to the VA since he has come in contact with the administration. His handwriting is tremulous and he has to hold on to the right hand tightly with the left to steady himself. At rest the hand is not tremulous. Insight and judgment is good. This veteran is above normal intelligence.
Industrial Adjustment: Veteran states that he is a lawyer and because of his condition he is unable to have a private practice. He states that he has applied at various corporations to do law work but was not accepted because of his condition. However, he felt that he had to do something to sustain himself. He states that he sent at least fifty letters to various places to get some job in teaching. He finally decided that the easiest place for him to get a job would be where there is a great deal of shortage of teachers because of low salary. Since September 1959 he has been teaching in Washington City in the State of North Carolina earning $290. a month. He lost one day because of his condition. When he gives an examination or he has to give out some notes to his pupils he has somebody to do a stencil because of his tremulous handwriting. He goes to some university two nights a *106 week in order to get Ms credits for teaching. He is permitted to teach on a temporary basis, because of the shortage of teachers at North Carolina as stated above. It is interesting to note that we are dealing with an attorney, with apparently above normal intelligence who was once a vice-president of Temple University, and a consultant to the State Department. He now is unable to do his law work because of his condition. Because of his motivation and his need to sustain himself he has obtained a job at North Carolina for a salary of $290. a month. This certainly is a let down and a definite decrease in earning capacity.
Social Adjustment: Veteran is living alone in a room at the present time in Washington City, North Carolina. He spends his time preparing his lessons and lectures for the class and goes to some University two nights a week to get some extra credits for teaching. He does not have too much social life because of his teaching, going to school and because of his condition.
Comment: When I last examined veteran on October 3, 1957 I stated that there was a possibility that he may have Parkinsonism but I did not include this in the final diagnosis. In service veteran did have malignant tertian malaria which may effect [sic] meninges or cortex and produce encephalitis. However, he does not suffer from the encephalitic type of Parkinsonism because in this type rigidity is usually present as well as other manifestations. Veteran has no rigidity today.
In addition to the functional element, the Naval records mention a few times that there was a suspicion that he may have a neurological disorder but none was made, [sic] Electro-encephalogram on a few occasions showed definite abnormality and cause also not ascertained.
The veteran was discharged from service on March 29, 1946. Approximately thirteen months later he was examined on April 24,1947 for compensation purposes. Being an independent and well motivated individual he told the examiner that he was not interested in compensation and that he only filed a claim for [the] purpose of future security in case he finds himself disabled. He complained of pressure over frontal head “shaking of head which I am conscious of, occasionally] at night I get attacks of shaking especially with a tired feeling when I am pushed too hard physically”. In addition to his anxiety the examiner at that time observed tremors of the head when *107 the veteran discussed various phases of his malaria and when he was placed under stresses and strain [of] questioning about details of Ms life. This does not necessarily eliminate the diagnosis of Parkinsonism as in many such cases tremors are brought on or aggravated by tension, emotional upsets or fatigue.
As the years went by the tremors of the head became progressively worse and more obvious so that they were even present without tension and fatigue. In addition his right hand was also affected in that his handwriting is tremulous and when he has to write he must hold the pencil very tightly with the aid of the other hand.
There was a Naval Form “Special Examination and Treatment Bequest — Hospital File #7 (25) [”] dated July 15,1945 requesting an EEG. “Beport of Examination and Consultation” dated June 16,1945 states “facial tremors, cooperative generalized abnormal EEG”.
Now that years have gone by and symptoms have become progressively worse the symptoms and findings at the Navy take on more light. One may conclude that the facial tremors were the incipient manifestations of Park-insonism Disease. It is well known that this disease starts very slowly and it may take some time until the diagnosis is made.
Considering the picture as a whole it is my certified opinion that Parkinsonism may have well began [sic] wliile he was in service.
Diagnosis: (1) Anxiety Beaction, moderate to moderately severe with depressive features. (2) Parkinsonism Disease.
/s/
I. KOTZIN, M.D.
Neuropsychiatrist
Outpatient Clinic
58. On February 1,1960, the VA entered its rating decision based upon the examination quoted above. The pertinent portions of such rating decision of the VA Bating Board are abstracted as follows:
J: Scheduled VA examination.
I: SC for Parkinsonism.
F: At cited VA examination veteran’s head was found to be in constant tremor except for periodic momentary relief. His handwriting was *108 tremulous and be bad to hold on to the right hand tightly with left to steady himself. Because of his condition he has been unable to obtain employment at law work and has been forced to take a low paying teacher’s job in N.C. Review of service clinicals shows that when an electroencephalogram was taken on 6/15/45 there was noted facial tremors; cooperative. When examined by VA on 4/24/47 veteran complained and showed shaking of the head. The present NP examiner certified that it is his opinion that the facial tremors in service may well have been the incipient manifestations of Parkinsonism. In addition veteran continues to manifest an anxiety reaction, mod. to mod. sev. with depressive features.
D: On resolution of reasonable doubt in veteran’s favor, it is determined that Parkinsonism originated during WW II service. No improvement is expected.
1. SC Inc WW II 88 USC 310 60% from 12/17/59
8004 Parkinsonism
50% from 10/3/57 to 12/16/59
30% from 12/17/59
9105 ANXIETY REACTION
0% from 3/30/46
7338 HERNIA INGUINAL LEFT
6304 MALARIA
59. Dr. Harold Stevens, Professor and Head of the Department of Neurology at George Washington University School of Medicine, testified that plaintiff is suffering from brain damage incurred some time in 1943, “that it continued to plague him to get worse and in a continuous unbroken series of clinical manifestations, eventuated in readily recognized extra-pyramidal disease associated with a psychiatric syndrome, as described in the record, manifested by tension, anxiety, depression, tearfulness, social and occupational maladjustment”.
60. Dr. Stevens made the following comment on plaintiff’s partial successes in his post-service employment: “Without question, his achievement is presently based on great perseverance. In all probability, prior to the onset of this organic *109 debility, bis functioning level was considerably higher, much more stable, and more consistent with the very high superior intelligent quotient of 134”.
61. Defendant’s expert witness, Dr. Evans Diamond, testified at the second trial that plaintiff was physically fit to perform “full duty” at the time of his release in 1946. This opinion is not probative if only in view of the fact that by Navy order, plaintiff could not have been sent to any of the malarial areas of the world in which the TJ.S. Navy operated. More importantly, plaintiff was suffering from brain damage which rendered him not fit for duty. This fact, if not obvious at time of plaintiff’s separation, is abundantly clear in light of plaintiff’s subsequent history. In addition, Dr. Diamond, defendant’s medical witness at the 1966 trial, adhered to his erroneous procedure and limited the evidence upon which his opinions were based to the pre-release medical records, instead of considering and weighing all of the evidence.
62. The conclusion of Dr. Stevens, plaintiff’s expert in neurology and electro-encephalography, is summarized in his answer to Commissioner Day’s question, “How can it be shown that they [the naval doctors] were wrong in their sizing up the situation” ? when he stated:
“In two ways. Actually in three ways. One, the history which is quite persuasive for cerebral malaria. This, in itself, should have alerted the doctors to the fact that there would be effects from cerebral malaria. The malaria is well documented. That is not a medical issue at all.
“Secondly, he has had repeated bouts, based on the history of attacks, at which he has not been able to perform any sustained effective duty.
“In addition, he shows psychiatric manifestations which are classically recognized by authorities as manifestations of cerebral malaria.
“In addition he has a tremor which is classical for extra-pyramidal disease and encephalitis, arid finally, he has two abnormal EEGs.
“If this were not enough, there is no other evidence of any competent producing cause of brain damage, other, in his history I am referring to, other than the malaria or the encephalitis.
“So, I think the string of events, as far as evidence is concerned, medical evidence, is unassailable and the de *110 duction is inescapable that at that time lie bad brain damage and that it began in 1943 and was progressive.
“Then, if we extend and project ourselves years later, it is reaffirmed by subsequent developments”.
63. In reviewing the action of the Naval Correction Board the correct legal standard is whether the Board’s action is supported by substantial evidence on the whole record as this term is defined: “[t]he fact that there is evidence, considered of and by itself, to support the administrative decision is not sufficient where there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial on the record as a whole”. Powers v. United States, 176 Ct. Cl. 388, 400 (1966) citing Williams v. United States, 130 Ct. Cl. 435, 441, 127 F. Supp. 617, 619 (1955), cert. denied, 349 U.S. 938. In view of this legal standard and all of the facts of record, we must conclude as an ultimate finding of fact that the decision of the Correction Board and the Secretary of the Navy was not supported by substantial evidence.
CONOLtrSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover retirement pay from the day following the date of release from active duty, less amounts received as disability compensation from the Veterans Administration* and pay for Beserve Officer training astd eivihaB: ee-mpsnsa-tion*, since his release from active military sendee. Judgment is entered accordingly. The amount of recovery will be determined pursuant to Buie 47(c).

 The court acknowledges the assistance It has receives from the report of Trial Commissioner William E. Day, although we have reached a different conclusion.

 See also, Beckham v. United States, 179 Ct. Cl. 539, 543, 375 F. 2d 782 (1967) ; Walters v. United States, 175 Ct. Cl. 215, 224, 358 F. 2d 957 (1966) ; Grudin v. United States, 166 Ct. Cl. 272, 301, 333 F. 2d 861 (1964) ; Harper v. United States, 159 Ct. Cl. 135, 140, 310 F. 2d 405 (1962).

 Amended per Order dated October 4, 1968.

 This statement, apparently made to the VA doctor, appears to be a gross exaggeration. The record shows that the plaintiff was 11 pounds below standard weight when he entered active duty in 1942, weighing 149 pounds. In May 1943, at the height of his malarial attache, his weight was 135 pounds. See finding 11.

 It is noted tliat there had not been an actual diagnosis of cerebral malaria by any Navy doctor at this time, although it had been suspected. Cf. finding 25 entry 7-17-45 (history) and finding 27 (summary of case history).

 Amended per Order dated October 4, 1968.